**ELM SPRING FARM, Inc., et al. v. UNITED STATES.**

No. 3726.

Circuit Court of Appeals, First Circuit.

May 8, 1942.

Melville F. Weston, of Boston, Mass., for Elm Spring Farm Cooperative, appellant.

Warren Patten, of Boston, Mass. (Richardson, Wolcott, Patten & Bennett, of Boston, Mass., on the brief), for Elm Spring Farm, Inc., and Etta S. Giles, appellants.

Joseph P. Rooney, Asst. U. S. Atty., of Boston, Mass. (Edmund J. Brandon, U. S. Atty., of Boston, Mass., and John M. Durbin, Sr. Atty., Dept. of Agriculture, of Washington, D. C., on the brief), for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

The present case began as a civil complaint in the court below, filed by the United States, on request of the Secretary of Agriculture, under § 8a(6) of the Agricultural Adjustment Act, 48 Stat. 31, as amended by 48 Stat. 670, 675, and further amended by 49 Stat. 750, and as reenacted and amended by the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U.S.C.A. § 608a(6), hereinafter referred to as the Act. Named as defendants were Elm Spring Farm, Inc., Elm Spring Farm Cooperative, hereinafter referred to as the "Cooperative," Etta S. Giles, Howard L. Chisholm, Harry C. Fallis and Francis Cummings. The complaint sought to enforce compliance with Order No. 4, as amended, issued by the Secretary of Agriculture under authority of the Act.

Reference is made to our opinion in Green Valley Creamery, Inc. v. United States, 1 Cir., 1939, 108 F.2d 342, 344, 345, for quotation of pertinent portions of the Act. In that opinion (pages 343, 344 of 108 F.2d), and in H. P. Hood & Sons, Inc. v. United States, 1939, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478, the terms of Order No. 4 as amended are summarized, and a description is given of the producer settlement account or equalization pool by means of which each producer of milk receives a so-called "blended price," computed by the market administrator as directed in the Order, regardless of the use to which the particular milk may have been devoted.

Separate motions to dismiss were made by each defendant, with the exception of the Cooperative. In an interlocutory order for preliminary injunction, dated April 1, 1941, the district court allowed the motions to dismiss filed by Chisholm, Fallis and Cummings. The motions to dismiss filed by Elm Spring Farm, Inc., and Giles were denied, the court in an accompanying memorandum stating that "The bill should be retained against these defendants in order to give full effect to the injunction which is to be issued." Answers were filed by the Cooperative, Elm Spring Farm, Inc., and Giles.

Upon application for a preliminary injunction the case was heard on the pleadings and affidavits, on a stipulation as to certain facts and on oral evidence offered by the plaintiff, together with exhibits submitted by the parties.

The district court made certain findings of fact and rulings of law, and on the basis thereof issued its preliminary injunction on April 1, 1941. Thereafter the parties agreed by stipulation to submit the case to the court for final determination upon the pleadings and upon the evidence theretofore taken and upon the motions to dismiss, without waiver of any of the rights hitherto saved by the respective parties. On May 19, 1941, the court entered its final decree in the plaintiff's favor and on June 12, 1941, entered its amended final decree. The defendants have taken an appeal from the foregoing final decree and amended final decree.

From the record, the following facts appear:

Prior to August 1, 1937, the defendant Etta S. Giles was the sole stockholder of Elm Spring Farm Company, a Massachusetts corporation, which was engaged in the business of receiving, buying, processing, selling and distributing milk in the Greater Boston Marketing Area. Giles

was president and Chisholm acted as treasurer and manager. The directors were Giles, Chisholm and Julia M. Cummings, wife of the defendant Francis Cummings. The latter, though having no connection with the company, was consulted from time to time in an advisory capacity. On August 1, 1937, Order No. 4, as amended, became effective. Thereafter a complaint was filed in the court below by the United States seeking to compel the Elm Spring Farm Company to comply with the Order. A decree went against the Company in the district court. In lieu of an appeal a stipulation was filed in which it was agreed that the defendant would be bound by the determination of a similar case, United States v. Wm. T. Jones Co., then on appeal to this court. In the Jones case we affirmed a decree requiring the defendant to comply with Order No. 4, as amended. Green Valley Creamery v. United States, 1 Cir., 108 F.2d 342. On December 27, 1940 (the date on which the complaint in the case at bar was filed), a contempt petition was pending in the district court against Elm Spring Farm Company, Giles and Chisholm for alleged violations of the court's decree.

On March 16, 1940, Giles as president of Elm Spring Farm Company was authorized to execute and deliver an option to the defendant Cummings for the purchase by him of all the assets of the company at a price of $30,000. This option was never exercised.

On May 1, 1940, Elm Spring Farm, Inc., a Massachusetts corporation, was formed. Giles became its president, Chisholm its treasurer and manager, and the board of directors consisted of Giles, Chisholm and Cummings. Chisholm subscribed to 50 shares, or half the capital stock, of Elm Spring Farm, Inc., and in payment therefor gave to the latter corporation his note in the sum of $15,000, secured by a pledge of the said shares of stock. At the same time Elm Spring Farm, Inc., purchased all of the assets of Elm Spring Farm Company and paid therefor by issuance to the Company of the remaining 50 shares of its common stock and by assignment to the Company of Chisholm's note for $15,000 secured as aforesaid. Elm Spring Farm, Inc., also assumed all the liabilities of Elm Spring Farm Company. The stock and note so received by the company in payment for its assets were distributed to its sole stockholder, Giles. Giles thus became the owner of 50% of the stock in Elm Spring Farm, Inc. and held a lien on the other 50% to secure payment of Chisholm's note.

Elm Spring Farm, Inc., continued to operate the milk business as the successor to Elm Spring Farm Company until June 15, 1940. As the latter had done, Elm Spring Farm, Inc., purchased milk from certain producers in New Hampshire and from other handlers. It processed this milk at Lyme, New Hampshire, and at Waltham, Massachusetts, and disposed of it in the Greater Boston Marketing Area.

Meanwhile Cummings, Chisholm, Giles and David Greer, Esq. (counsel for Elm Spring Farm Company and Elm Spring Farm, Inc.) had been exploring the possibility of incorporating a cooperative to engage in the production and distribution of milk. Cummings visited the various dairymen in and around Lyme, New Hampshire, who had been selling their milk to the Company and to Elm Spring Farm, Inc., and found them receptive to the scheme. Accordingly, on May 31, 1940, the defendant Elm Spring Farm Cooperative was organized as a cooperative corporation under the provisions of Chapter 157, § 3, of the General Laws of Massachusetts (Ter.Ed.). Giles, Chisholm, Cummings, Fallis and Greer became the directors of the Cooperative. Fallis became the president, Giles comptroller, and Chisholm treasurer. The compensation of Giles and Chisholm as comptroller and treasurer, respectively, was to be fixed by Fallis in his capacity as president. Fallis was president of the Somerville Trust Company, at which bank Elm Spring Farm, Inc., deposited some of its funds. The salaries of Giles and Chisholm were fixed at $75 a week. Giles' services seem to have been more or less nominal and of an advisory character. Later, Richard K. Prescott, a farmer member of the Cooperative, became president.

The Cooperative set up in business on June 16, 1940, under a complicated network of contracts and agreements.

By an agreement between the Cooperative and Elm Spring Farm, Inc., the Cooperative became sublessee of the premises in Waltham theretofore occupied by Elm Spring Farm, Inc., agreeing to pay as rent an amount equal to the rental the latter was obligated to pay as lessee. By the same agreement Elm Spring Farm, Inc., leased to the Cooperative all its facilities for receiving, buying, processing,

selling, and distributing milk, together with its route lists and trade information, for an annual rental which by subsequent amendment of the agreement was fixed at $7,800 per annum. Cooperative agreed to maintain the operating and delivery equipment in the same condition in which it was at the inception of the agreement and from time to time to replace any such equipment as might become worn out or obsolete. Upon termination of the agreement for whatever cause and at whatever time, the Cooperative was to return to the lessor the said operating and delivery equipment or in lieu thereof to replace it with equipment of the same character and value. For five years after the termination of the agreement the Cooperative covenanted not to solicit the business of any person who had theretofore been a customer of Elm Spring Farm, Inc., or who had, during the continuance of the agreement, become a customer of the Cooperative. Further, the Cooperative agreed for a period of five years after such termination not to engage in the milk business at any place within 25 miles of the Waltham premises or within 25 miles of the receiving station at Lyme, New Hampshire. The agreement was to run from year to year "provided, however, that either party hereto may by a calendar month notice, given on or before the first day of any calendar month to be effective on the last day of such calendar month, terminate this agreement."

Various agreements were made between the Cooperative and the farmer producers who had theretofore been selling their milk to Elm Spring Farm, Inc. By stipulation, the agreements with one Gerald W. Davis of Lyme, New Hampshire were to be taken as typical. By bill of sale Davis conveyed his herd of cattle to the Cooperative at a stated price. The Cooperative paid for the cattle by giving him a promissory note for 75% of the price payable on demand, with interest, after demand, at the rate of 5%. The note was secured by a personal property mortgage on the cattle so purchased from Davis. The balance of the purchase price was paid by the issuance to Davis of shares of stock in the Cooperative of a par value of $10 a share. By separate agreement Davis agreed that he would repurchase from the Cooperative at any time on demand any of the milk cows so sold to the Cooperative and would pay to or credit the Cooperative with an amount equal to the purchase price set forth in the bill of sale for such cows; also, he agreed that he would upon demand by the Cooperative purchase from the latter any calves born of said cows and would pay or credit the Cooperative with an amount which should be equal to any expenses incurred by the Cooperative in connection with the birth, feeding and care of such calves up to and including the date of the purchase. On its part the Cooperative agreed that it would keep and maintain the cows at a place in New Hampshire or elsewhere which should be satisfactory to Davis; and that it would within 90 days after demand from Davis sell back to him any of the cows or calves, payment therefor to be made by crediting Davis on any balance due him with an amount equal to the purchase price set forth in the bill of sale, or if such purchase price should exceed any balance due, then the excess to be paid in cash. By a separate "Maintenance Contract" Davis agreed to graze, pasture and feed the cows upon his farm, to comply with all laws and regulations relating to the production, care and handling of milk for human consumption as fluid milk, and to deliver to the Cooperative the milk produced by the cows except such portion thereof as he retained for the personal use of himself and family. The Cooperative agreed to pay Davis for his services, including all obligations for feed or other costs "such amounts and at such times as shall be from time to time mutually agreed upon." The maintenance contract was to run from year to year subject to termination by either party on 90 days' notice. In another contract, called a "Guaranty," Davis guaranteed to the Cooperative "that the entire cost of production of milk by said cattle to it shall not exceed at any time the blended price as announced by the Milk Administrator for the Federal Milk Marketing Order in Boston, Massachusetts, plus twenty-three cents per hundredweight"; this cost to include personal property taxes and "any expenses for medical care of the dairy cattle or losses caused by injury, sickness or death."

On and after June 16, 1940, these farmers, now in the guise of so-called "herdmasters," delivered to the Cooperative the milk produced on their respective farms. By vote of the directors the Cooperative, ostensibly as compensation for the services rendered under the maintenance contract, paid the "herdmasters" for the milk

. so delivered an amount equal to the blended price announced by the administrator from time to time plus twenty-three cents per hundredweight. In addition, the "herdmasters," as shareholders in the Cooperative, were eligible to receive dividends out of profits, if any, made by the Cooperative.

Some milk was bought by the Cooperative from independent producers who were not shareholders in the Cooperative.

At the time of the hearing 1447 shares of stock in the Cooperative were outstanding. 1412 of these shares were in the hands of 32 farmers. The remaining 35 shares were held, one share each, by 35 subscribers, comprising the individual defendants, their relatives, friends, employees, or the office or plant employees at Waltham, Massachusetts, or Lyme, New Hampshire. Since each shareholder had one vote regardless of the number of shares held by him, it may be inferred that the voting control was in the hands of Giles, Chisholm and their associates. As previously indicated, the shares which had been issued to the "herdmasters" were issued in part payment of the purchase price of the cows. In the case of the remaining 35 individual subscribers, some at least of their shares were paid for in cash; Greer testified that he paid the subscriptions for five of these shareholders. But in any event the amount of capital so contributed was negligible. The only other assets of the Cooperative were its equity in the cows and its own accounts receivable from milk customers. Apparently the Cooperative got some working capital by collecting the accounts receivable from customers of Elm Spring Farm, Inc. The Cooperative became a debtor of Elm Spring Farm, Inc. for the amounts so collected and gave its promissory notes therefor to the latter corporation.

Cooperative, as thus constituted, admittedly became a "handler" of milk, within the meaning of the Act and of the Order, on and after June 16, 1940. § 904.5 of the Order requires handlers to make periodic reports to the market administrator setting forth accurately the sources and quantity of milk received by the reporting handler, and the uses for which such milk has been disposed of. Based upon these reports, the market administrator, in accordance with the provisions of § 904.7 of the Order, computes the blended price which, as specified in § 904.8, the handlers shall pay to producers, either directly or through the equalization pool, for the milk delivered.

In making its reports, Cooperative has reported the milk delivered to it from its so-called "herdmasters" as milk received from its "own farm production." Under § 904.6 (2) of the Order it is provided:

"In the case of a handler who is also a producer and who received milk from producers, the market administrator shall, before making the computations set forth in sec. 904.7, (a) exclude from such handler's Class I milk up to but not exceeding 90 percent of the quantity of milk received from his own farm production, (b) exclude the milk received by him in each class from other handlers, and (c) exclude from his remaining Class II milk the balance of the milk received from his own farm production. * * *"

Since Cooperative as a handler had more than the market average of Class I fluid milk sales during the periods in question, the reporting as its own farm production of milk which should have been reported as received from producers, would, if uncorrected, have the effect of lowering the uniform "blended price" receivable by producers generally. It would also have the effect of understating the amounts payable into the equalization pool by Cooperative as required by § 904.8(b) (3).

Upon verification of Cooperative's reports the market administrator ruled that milk received by Cooperative from its so-called "herdsmen" should have been classified as milk received from producers and not milk received from its "own farm production"; and accordingly the market administrator billed Cooperative for the additional sums which it claimed that Cooperative owed the producer settlement account. Upon refusal of Cooperative to make the additional payments or to change its manner of reporting the milk received from its "herdsmen," the United States filed the present complaint in the court below.

On application for a preliminary injunction the district court made its findings of fact, and concluded as a matter of law that "Elm Spring Farm Cooperative is not a producer within the meaning of Order No. 4, as amended, and that the milk which it handles is not its own farm production insofar as it procures it from its so-called herdsmen. I also find and rule that Elm Spring Farm Cooperative is

a handler of milk within the meaning of Order No. 4, as amended." The preliminary injunction ordered Cooperative to make the payments found to be then due to the market administrator and to comply with Order No. 4 as amended. It also enjoined the Cooperative and Elm Spring Farm, Inc., from making certain payments and transfers of assets and from disturbing the status quo. The preliminary injunction is set forth in the footnote.[1] The final decree dated May 19, 1941, ordered Cooperative to pay the market administrator the sum of $8,168.99; ordered Cooperative, Elm Spring Farm, Inc., and Etta S. Giles, their officers, agents, servants, employees, and attorneys, to comply with the provisions of § 904.5 relating to reports of handlers and § 904.8 referring to payments for milk. The supplementary relief given in the preliminary injunction was continued in effect pending appeal. The amended final decree dated June 12, 1941, relaxed somewhat the terms of the supplemental relief so as to permit Cooperative to make certain payments and Elm Spring Farm, Inc., to receive the same. The terms of the final decree and amended final decree are copied in the footnote.[2]

---

[1] "This cause came on to be heard upon the prayer for a preliminary injunction upon the motions to dismiss of the defendants Elm Spring Farm, Inc., Cummings, Giles, Fallis and Chisholm, and upon the motions to strike filed by all the defendants except Chisholm, and was argued by counsel and thereupon, upon consideration thereof, it appearing that the defendant Elm Spring Farm Cooperative is not a producer within the meaning of Order No. 4, as amended, and that the milk which it handles is not its' own farm production in so far as it procures it from its so-called herdsmen but that the said defendant, Elm Spring Farm Cooperative, is a handler of milk within said Order No. 4, as amended, it is accordingly ordered,

"A. That the defendant, Elm Spring Farm Cooperative, its officers, agents, servants, employees and attorneys, and all those persons in active concert or participation with it who receive actual notice of this order by personal service or otherwise, be and they hereby are enjoined from

"(1) Paying over to the defendant Elm Spring Farm, Inc., as rent or otherwise any of its assets;

"(2) Paying over to Etta S. Giles as salary or otherwise any of its assets;

"(3) Reselling or in any manner causing the resale of cows whose title stands in its name or in any manner encumbering its assets;

"(4) Repurchasing from its stockholders any shares of stock in said Cooperative;

"(5) Disposing of, or encumbering, any of its assets, except in the regular and usual course of business;

"(6) Paying to its members or to those from whom it procures its milk any sort of consideration for the milk so procured which would be in excess of the amount due said persons if the pounds of milk procured were multiplied by the price announced by the market administrator adjusted for butterfat content and other differentials for milk delivered by regular producers to a plant located in the 16th zone; until further order of court.

"B. That the defendant, Elm Spring Farm, Inc., its officers, agents, servants, employees and attorneys and all those persons in active concert or participation with it who receive actual notice of this order by personal service or otherwise, be and they hereby are enjoined from

"(1) Paying or turning over any of its assets to the defendant Giles, or in any manner disposing of its assets, except in the regular and usual course of business, or in any manner encumbering its assets;

"(2) Seeking to enforce the terms of the rental contract of June 16, 1940, against the defendant, Elm Spring Farm Cooperative, and from receiving anything as rent or otherwise from the Elm Spring Farm Cooperative; until further order of court.

"C. That the defendant Elm Spring Farm Cooperative

"(1) Pay to the market administrator forthwith the sums due the market administrator in accordance with the bills rendered by him which have been stipulated to be mathematically correct.

"D. That the defendant Elm Spring Farm Cooperative, its officers, agents, servants, employees and attorneys and all those persons in active concert or participation with it who receive actual notice of this order by personal service or otherwise

"(1) Comply, as a handler, with the provisions of the Agricultural Marketing Agreement Act of 1937 and Order No. 4, as amended; until further order of court."

[2] Final Decree (May 19, 1941).—"This cause having been submitted upon a stipulation of the parties waiving their claim to a jury trial and submitting the action for the consideration and determination of the court upon the pleadings and upon the evidence introduced at the

926

We agree with the district court that Cooperative is not a "producer" and that the milk received from its so-called "herdsmen" is not milk of its "own farm production" as those terms are used in the Order.

If Cooperative had had the straightforward purpose of becoming a producer of milk it would hardly have negotiated the rather weird series of agreements previously summarized in this opinion. The regulatory scheme embodied in the Order is an intensely practical business, and the question now before us is not to be determined by a purely abstract inquiry as to who had "title" to the cows which produced the milk. Certainly the "herdsmen" had been the producers during the time when they were delivering milk to Elm Spring Farm Company and Elm Spring Farm, Inc. Despite their agreements with Cooperative there was no substantial change in their status. Cooperative did not acquire any farm or invest any capital in milk production. The "herdsmen" retained possession of their respective farms and of the herds of cattle thereon. The risk of loss in the production of milk remained upon the individual farmers by virtue of the terms of the "Guaranty." At any time Cooperative might require the farmer to take back "title" to any of the cows, paying therefor the full original purchase price, though the cow may have outlived its usefulness as a producer of milk. The farmer himself, upon 90 days' notice, might similar-

hearing on the preliminary injunction, and the motions to dismiss, without waiving certain rights and objections as will appear more fully in the stipulation, and having been fully considered by the court, it is accordingly adjudged, ordered and decreed, as follows:

"A. That the defendant Elm Spring Farm Cooperative pay to the market administrator forthwith the sums due the market administrator in accordance with the bills rendered by him which have been stipulated to be mathematically correct. This amounts to $8,168.99.

"B. That the defendants Elm Spring Farm Cooperative, Elm Spring Farm, Inc., and Etta S. Giles, their officers, agents, servants, employees, and attorneys, and all those persons in active concert or participation with them, or any of them who receive actual notice of this order by personal service or otherwise, be and they hereby are permanently enjoined from handling milk in violation of the provisions of the Agricultural Marketing Agreement Act of 1937, and Section 904.5 relating to reports of handlers, and Section 904.8 referring to the payments for milk.

"C. That the defendants Elm Spring Farm Cooperative, Elm Spring Farm, Inc., and Etta S. Giles, their officers, agents, servants, employees, and attorneys, or any of them who receive actual notice of this order by personal service or otherwise, be and they hereby are commanded and directed to comply with the provisions of the Agricultural Marketing Agreement Act of 1937, and Section 904.5 relating to reports of handlers, and Section 904.8 referring to the payments for milk.

"D. That the interlocutory order for a preliminary injunction dated April 1, 1941, be continued in full force and effect pending the final disposition of this case, or, in the absence of an appeal herefrom, pending the expiration of the statutory appeal period."

Amended Final Decree (June 12, 1941). —"At a further hearing, after the final decree of May 19, 1941, representations were made by the defendants that the effect of paragraph D of said decree would be to compel the defendant Elm Spring Farm Cooperative to discontinue business, and it appearing that payment of certain rents from one defendant to the other will not seriously prejudice the plaintiff, after having been fully considered by the court, it is accordingly adjudged, ordered and decreed as follows:

"That paragraph D of the final decree is amended by adding the following thereto:

"Except that the defendant Elm Spring Farm Cooperative is permitted to pay, and the defendant Elm Spring Farm, Inc., is permitted to receive:

"(a) The sum of $125 per month, and the amount of such taxes as have accrued since June 15, 1940, as provided in a realty lease between the parties, and

"(b) The sum of $500 per month as part payment of rent reserved for the use by Elm Spring Farm Cooperative of certain personal property owned by Elm Spring Farm, Inc.

"That such sums as are received by Elm Spring Farm, Inc., under this paragraph shall be held and retained by it, pending the determination of any appeal herefrom, except for such dispositions as may occur in the regular and usual course of business. The injunction against payment by Elm Spring Farm, Inc., of any amount of money or the transfer of any of its assets to the defendant Giles, as salary or otherwise, is continued in full force and effect."

ly demand a retransfer of title to any or all of the cows. He is permitted to retain such portion of the milk as he chooses for the personal use of himself and his family. He is paid by Cooperative only on the basis of the quantity of milk he delivers to Cooperative, and the amount of the payment is calculated by reference to the "blended price" fixed by the administrator plus twenty-three cents per hundredweight.

In effect what Cooperative did was to say to the farmers: "If you will become a party to this elaborate camouflage we will pay you 23¢ a hundredweight more than the blended price for your milk." How did the promoters of Cooperative imagine that it would be profitable to make such an offer? The explanation is plain. Cooperative, by claiming the milk so received to be milk of its "own farm production," expected to escape making payments into the equalization pool, and thus to obtain an important competitive advantage over other handlers who had more than the market average of Class I fluid milk sales. If this claim of Cooperative should be accepted as within the law, such other handlers would be driven to making similar arrangements with their producers. The result inevitably would be that the whole regulatory scheme would break down. The maintenance of the uniform blended price to each producer, whether or not his milk goes predominantly into the fluid milk market, is impossible unless handlers who have more than the market average of fluid milk sales make the prescribed equalization payments into the pool. The Act and the Order seek to achieve a fair division of the more profitable fluid milk market among all producers, thereby eliminating the disorganizing effects which had theretofore been a consequence of cutthroat competition among producers striving for the fluid milk market. This is clearly set forth in the opinion in United States v. Rock Royal Co-operative, Inc., 1939, 307 U.S. 533, 548, 550, 59 S.Ct. 993, 83 L.Ed. 1446.

Cooperative might have become a producer by acquiring a farm and milk cows and going into the business of operating a dairy farm with the attendant risks of loss. "It chose to employ the scheme in question here. It considered it advantageous to avoid the risks of production and now must bear the burdens of a determination that other entities than itself are the producers." Gray v. Powell, 1941, 314 U.S. 402, 414, 62 S.Ct. 326, 86 L.Ed. ——.

Appellant Cooperative relies upon a narrow reading of §§ 8c(5) (A)–(E) of the Act, 7 U.S.C.A. § 608c(5) (A–E). These sections, which delimit the contents of orders to be issued under the Act, refer to milk "purchased" from producers by handlers, and "prices" to be paid by handlers for milk so purchased. The argument is as follows: "Nothing in the language of the Act anywhere modifies the ordinary meaning of these words or authorizes an order to contain any monetary provisions applicable to a person, i.e., in this instance, a corporation, engaged in the distribution of milk given by its own cows. In such a case it is manifestly impossible for a 'purchase' to take place, with respect to milk which has been the property of such person, not merely from the instant of its being drawn into the pail, but even from the very earliest instant in its process of creation in which it could be recognized as having any existence whatsoever." This contention is foreclosed by United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 578–581, 59 S.Ct. 993, 83 L.Ed. 1446. In that case the cooperative in question acted as a marketing agent for its members. Order 27 regulating the handling of milk in the New York Metropolitan Area required such cooperative handlers, the same as other handlers, to make the stipulated payments into the producer settlement account or equalization pool. It was contended that "coöperatives which merely act as agents for their members are not included in handlers purchasing from producers." Pointing out that such an interpretation of the Act would render the regulatory scheme nugatory, the court held that as used in the Act "the word 'purchased' means 'acquired for marketing.'" (307 U.S. at page 580, 59 S.Ct. at page 1016, 83 L.Ed. 1446) Again (at page 581 of 307 U.S., at page 1016 of 59 S.Ct., 83 L.Ed. 1446) the court said: "As the coöperative does not have its own farm but is itself a handler under the Act, it must pay into the producer settlement fund."

If the Cooperative should be unsuccessful in avoiding payments into the equalization pool its whole reason for existence immediately evaporates. Apparently with this eventuality in mind, its contractual arrangements have been such that upon short notice it may fold its tents like the Arabs and as silently steal away. It has invested no capital in the milk production business. It may at any time retransfer to the individual farmers the "title" to the cows and

thereby cancel its theoretical obligation for the unpaid purchase price. Its leasing contract with Elm Spring Farm, Inc., is not an ordinary business arrangement between bargaining equals. Through interlocking officers and directors the persons who control Elm Spring Farm, Inc., also represented Cooperative in negotiating the lease. The high rental[3] which Cooperative obligated itself to pay presumably could be paid only so long as Cooperative was able to avoid making payments into the equalization pool. Upon one month's notice Elm Spring Farm, Inc., might terminate the lease and take back possession of the property leased, which Cooperative must return in as good condition as it was at the inception of the agreement. On such short notice Cooperative would then be effectively out of business and subject to a five-year obligation not to compete with Elm Spring Farm, Inc. Behind the screen of this tenuous lease agreement, the controlling interests in Elm Spring Farm, Inc., have contrived in substance to preserve the status of Elm Spring Farm, Inc., as a milk handler. It stood to profit from the competitive advantage which Cooperative sought to gain over other handlers. Now that we have determined that Cooperative has not escaped the obligation to make payments into the equalization pool, Elm Spring Farm, Inc., cannot escape the burden of that determination. During the course of its operation Cooperative has run up an indebtedness of several thousand dollars to the market administrator. Operating as it has been on a shoestring, Cooperative is probably financially unable to make good these payments now, as required by the decree below. Unless Elm Spring Farm, Inc., is held accountable, the loss will fall on milk producers as a class, to the prejudice of the scheme of milk regulation embodied in the Order.

■ Elm Spring Farm, Inc., was undoubtedly and avowedly a handler of milk, subject to the Order, up to June 15, 1940. Under the peculiar circumstances disclosed, we think there was no such clean-cut severance of its relationship to this milk handling business as to relieve it from its obligations as a handler in respect to the milk handled after that date in the name of the Cooperative. Cf. Luckenbach S. S. Co., Inc. v. W. R. Grace & Co., Inc., 4 Cir., 1920, 267 F. 676, 681. The decree of the court below against Elm Spring Farm, Inc., was within the competence of the court under § 8a(6), vesting in the several district courts of the United States "jurisdiction specifically to enforce, and to prevent and restrain any person from violating" any marketing order issued pursuant to the Act.

■ As to Etta S. Giles, she was at no stage individually a handler in the Greater Boston Marketing Area. The bill should have been dismissed as to her, as it was in respect to Chisholm. She and Chisholm jointly own the stock of Elm Spring Farm, Inc., but neither of them individually became handlers by virtue of such stock ownership. Of course, any order directed against the Cooperative or against Elm Spring Farm, Inc., is in effect a command to Giles and Chisholm as officers of those two corporations. Wilson v. United States, 1911, 221 U.S. 361, 376, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558.

The final decree of May 19, 1941, must be modified by striking out from paragraph B and paragraph C the reference to Etta S. Giles. We think the supplemental relief provided for in paragraph D of the final decree, as amended by the terms of the amended final decree dated June 12, 1941, fell within the discretion of the district court to preserve the status quo so as to assure compliance by the Cooperative and by Elm Spring Farm, Inc., with the decree of the court in the event of its affirmance on appeal.

The decree and amended final decree are modified as indicated in the foregoing opinion, and as modified are affirmed, and the case is remanded for further proceedings not inconsistent with this opinion.

---

3 $7800 a year is 26% of the value of all the assets of Elm Spring Farm, Inc. leased to Cooperative, assuming those assets to be worth $30,000, the price at which Cummings was given an option to purchase such assets under the option agreement of March 16, 1940.