**COSGROVE v. WICKARD, Secretary of Agriculture.**

**MARTIN S. COSGROVE & SONS, Inc., v. SAME.**

**Nos. 2094, 2095.**

District Court, D. Massachusetts.

March 16, 1943.

David Greer, of Boston, Mass., for plaintiffs.

Edmund J. Brandon, U. S. Atty., and Joseph P. Rooney, Asst. U. S. Atty., John S. L. Yost, Sp. Asst. to Atty. Gen., both of Boston, Mass., and Jesse E. Baskette, Jr., Associate Atty., Office of Solicitor, Department of Agriculture, of Washington, D. C., for defendant.

HEALEY, District Judge.

These cases arise under 7 U.S.C.A. § 608c (15) (B), as amended. That section vests in the District Courts jurisdiction to review rulings of the Secretary of Agriculture under the Agricultural Adjustment Act of 1933, 48 Stat. 31, as amended, and as amended and reenacted by the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246.

The two cases involved present substantially the same issues and will be decided together.

The orders which are the subject of this review are in substance orders of the Secretary refusing to determine that milk reported by the plaintiffs as of their own production as defined by Order No 4 regulating the handling of milk in the Greater Boston, Massachusetts Marketing area as amended, effective January 16, 1939, to February 4, 1940, and by Order No 4 as further amended effective February 4, 1940, to the end of the period.

The pertinent provision of Order No 4, as amended, in force from January 16, 1939, to February 4, 1940, is Article VI, Section 2, which is as follows: "In the case of a handler who is also a producer and who received milk from producers, the market administrator shall, before making the computations set forth in Article VII, (a) exclude from such handler's Class I milk up to but not exceeding 90 percent of the quantity of milk received from his own farm production. * * *"

Section 904.6(2) of Order No 4, as amended, effective February 4, 1940, reads exactly the same.

■ The purpose of both the Act and the Orders is "to achieve a fair division of the more profitable fluid milk market among all producers, thereby eliminating the disorganizing effects which had theretofore been a consequence of cutthroat competition among producers striving for for the fluid milk market." Elm Spring Farm, Inc., v. United States, 1 Cir., 127 F.2d 920, 927, citing United States v. Rock Royal Co-op., Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446.

■ It is a familiar principle that on a review such as this, the Court must accept as true the findings of an administrative body or officer, here the Secretary of Agriculture, unless such findings are clearly erroneous. As was said by the United States Supreme Court with reference to a review of a determination by the Director of the Bituminous Coal Division of the Department of Interior, in a matter left specifically by Congress to the determination of an administrative body, the function of review placed upon the courts is fully performed "when they determine that there has been a fair hearing, with notice and an opportunity to present the circumstances and arguments to the decisive body, and an application of the statute in a just and reasoned manner." Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 332, 86 L.Ed. 301. Although Gray v. Powell was decided under the Bituminous Coal Act of 1937, 15 U.S.C.A. § 828 et seq., that Act differed but little from the Act here involved with reference to determination by the administrative agencies of who are and who are not "producers", and with reference to judicial review. In fact, judicial review of rulings of the Market Administrator is limited by 7 U.S.C.A. § 608c (15) (B) to a determination of whether or not such rulings are "in accordance with law." See, also, Federal Security Adm'r v. Quaker Oats Co., 63 S.Ct. 589, 595, 87 L.Ed. ——, decided by the United States Supreme Court on March 1, 1943. In that case, involving a finding by the Federal Security Administrator under the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq., the Court said:

"Section 401 calls for the exercise of the 'judgment of the Administrator'. That judgment, if based on substantial evidence of record, and if within statutory and constitutional limitations, is controlling even though the reviewing court might on the same record have arrived at a different conclusion."

The Court must approach the problem guided by the principles enunciated above.

Most of the essential facts found by the Secretary of Agriculture are not in dispute. During the periods involved, August 1, 1939, to December 31, 1940, the handling of milk in the Greater Boston, Massachusetts Marketing area was regulated by Order No 4, as amended, effective January 16, 1939, until February 4, 1940, and by Order No 4, as further amended, effective February 4, 1940, until the end of the period in question. From August 1, 1939, to December 31, 1940, the plaintiff, Martin S. Cosgrove, doing business as Martin S. Cosgrove and Sons, was a handler of milk in the Greater Boston, Massachusetts Marketing area. From January 1, 1940, to De-

234

cember 31, 1940, the plaintiff in the second case, Martin S. Cosgrove and Sons, Inc., was a handler of milk in the same area. For the delivery periods from August 1, 1939, to December 31, 1939, the individual plaintiff filed reports of the receipt and disposition of milk with the Market Administrator, and for the delivery periods from January 1, 1940, to December 31, 1940, the corporate plaintiff filed similar reports with the Market Administrator. Both plaintiff's reported substantial portions of their milk as of their "own farm production." By letter dated June 25, 1940, the Market Administrator notified both plaintiffs that he had determined that such milk had been received from producers and that he was billing the plaintiffs accordingly. In July of 1940, both plaintiffs duly petitioned the Secretary of Agriculture for administrative review of these determinations, under Section 15(A) of the Act. Hearings were had on the petitions, and on August 31, 1942, the Secretary of Agriculture entered an order denying the relief requested and dismissing the petitions. The findings of fact made by the Secretary in each of these cases were substantially as follows:

The individual petitioner was doing business as Martin S. Cosgrove and Sons, at 3 Bruce Street, Dorchester, Massachusetts, and was engaged generally in distributing milk and cream in the Greater Boston, Massachusetts Marketing area, and was a handler as defined in Order No 4. Prior to the times here involved, the petitioner's source of milk supply consisted of other handlers. On or about August 2, 1939, Earl J. Gates of Cambridge, Vermont, executed a bill of sale, "purporting to sell to the petitioner 59 Jersey cows for $4,340, $520 being paid by check, and the balance by means of a note secured by a duly recorded mortgage upon the cows. Gates used the $520 toward the cost of equipment on the farm necessary in order to qualify the milk produced on the farm for shipment as fluid milk to Boston, Massachusetts. No payments on principal or interest were made in connection with the note during the period involved. Gates entered into a "herdmaster" contract with the petitioner under which Gates "agreed to care for the cattle, including the feeding and milking, to maintain no other milk-producing cattle on the farm", and to comply with rules of the petitioner designed to make the milk eligible for sale for fluid consumption under State and local health requirements in

Vermont and Massachusetts. Under the contract, Gates incurred the expenses of producing the milk from the cows and delivering the milk to the petitioner. Gates was compensated by the petitioner on the basis of $2.25 for each hundredweight of milk of 3.7 butterfat content delivered by Gates, subject to a differential for butterfat variation, the differential being the same as that in effect under Order No 4. On or about September 23, 1939, R. C. Place, of Essex Junction, Vermont, executed a bill of sale "purporting" to sell to the petitioner 55 cows for $4,480, $448 being paid by check, and the balance by a note secured by a duly recorded mortgage upon the cows. No payments on principal or interest were made in connection with the note during the period involved. Place entered a "herdmaster" contract with the petitioners similar to the one described above. Place incurred the expenses of producing and delivering the milk to the petitioner, and was compensated on the basis of $2 or $2.25 per hundredweight, subject to the same differential as described above. On or about December 9, 1939, Mrs. H. C. Rhodes, of Georgia, Vermont, executed a bill of sale to the petitioner "purporting" to sell 69 cows for $7,870, $787 of which was paid by check, and the balance by a note secured by a duly recorded mortgage on the cows. No payments on the principal or interest have been made in connection with the note. Wilbrod Luneau, who, before this transaction was a hired man on the Rhodes' farm, and who continued, after this transaction, to perform the same duties for the same compensation, entered a "herdmaster" contract with the petitioner similar to the one described above. The expenses of producing and delivering the milk were incurred by H. C. Rhodes (husband of Mrs. H. C. Rhodes), and the proceeds of the checks issued by the petitioner to Luneau pursuant to the "herdmaster" contract, were received by H. C. Rhodes. Milk, other than that produced by the cows "alleged" to have been sold to the petitioner, was produced on the Rhodes' farm and shipped by Rhodes to the St. Albans Co-operative Creamery. Some of the cows "ostensibly" sold to the petitioner were pure-bred stock registered with a pure-bred Holstein Association in the name of H. C. Rhodes and such registration continued after the "alleged" sale to the petitioner. Each of the "herdmaster" contracts was for a period of one year, continuing from

year to year thereafter, but could be cancelled by either party upon one month's notice. Each of the "herdmaster" contracts provided that the "herdmaster" would indemnify and save harmless the petitioner from loss or damage arising from the death of or injury to any of the cows covered by the contract. In the case of each of the "purported" sales of cows, the cows remained upon a farm owned or operated by the "alleged" vendor, and the "alleged" vendor continued to operate the farm in substantially the same manner as previously except that Gates equipped his farm to make the milk produced thereon eligible for sale as fluid milk under health requirements of the City of Boston, Massachusetts. The petitioner acquired no interest in any of such farms or the property thereon. Permits for the sale of the milk involved were obtained from the City of Boston Health Department. The permits indicated Martin S. Cosgrove as the producer. A principal purpose of the petitioner was, by means of these various transactions, to place himself in the status of a producer under Order No 4.

With reference to the corporate petitioner, substantially the following findings of fact were made by the Secretary:

The petitioner is a Massachusetts Corporation with its principal place of business at 3 Bruce Street, Dorchester, Massachusetts. Its officers and directors are Martin S. Cosgrove, the individual petitioner, President; Francis M. J. Cosgrove, Treasurer; Catherine E. Cosgrove, Clerk; Martin S. Cosgrove, Francis M. J. Cosgrove and Catherine E. Cosgrove, Directors. As of January 1, 1940, the corporate petitioner succeeded to the business of the individual petitioner, and the individual petitioner, as of the same date, "allegedly" transferred to the corporate petitioner the cows which had been "purportedly" purchased by Martin S. Cosgrove in 1939 in the transactions described above. During 1940, Gates furnished milk to the corporate petitioner from the cows "purportedly" purchased from him by Martin S. Cosgrove and transferred to the petitioner. Gates changed the number of cows in the herd from time to time, but no change was made in the mortgage of 1939, and no payments were made by the petitioner for the cows added to the herd. The milk was furnished and compensated for in the same manner and at the same rate as in the case of the individual petitioner, although no written "herdmaster" contract was entered

into between Gates and the petitioner. On May 11, 1940, Francis M. J. Cosgrove, as treasurer of the petitioner, entered into a year to year lease with Gates of the farm on which Gates' cows were located at a rental of $1,500, payable semimonthly. The lease was terminable by either party on a month's notice to be given on the first day of the month. No rent was shown to be paid under the lease. Gates kept a record of his costs and expenditures in connection with the production of milk and sent statements of such items to the petitioner, but payments were made only on the basis of the quantity and butterfat content of the milk. During 1940, milk from the cows "purportedly" purchased by Cosgrove in 1939 from Mrs. H. C. Rhodes and transferred to the corporate petitioner, was delivered to the petitioner in the same manner and at the same rate of payment as in the case of the individual petitioner, although no written "herdmaster" contract was entered into by the petitioner. There were some calves born of these cows during 1940. The male calves were sold by Rhodes and the heifers were removed to another farm owned or operated by Rhodes. The cows were represented as the property of H. C. Rhodes in the tax list submitted by Rhodes on April 14, 1940, to the town of Georgia, Vermont. Some of the cows were pure-bred stock registered with a pure-bred Holstein Association in the name of H. C. Rhodes and such registration continued during 1940. On January 31, 1940, Place "purportedly" sold to the petitioner 22 cows for $1,910 and 44 cows for $3,665. On the same date, the petitioner "purported" to sell to Place 32 cows for $2,575. The bill of sale evidencing this transaction was signed by Martin S. Cosgrove in his individual capacity. The only cash payment in connection with these transactions was a payment of $300 to Place by the petitioner. With respect to the "ostensible" sale of 32 cows to Place by the petitioner, Place credited the petitioner with $191, or 10 percent, on the alleged purchase price of $1,910, and credited the petitioner with $66.50 on the alleged purchase price of $3,665, which together with a $300 cash payment by the petitioner, amounts to 10 percent of $3,665. For the balance of the alleged purchase price of $1,910; namely, $1,719, a note secured by a mortgage on the cows was prepared. Whether or not the note was signed was not shown, and the copy of the note submitted in evidence bears no signature. The mortgage was executed by

Francis M. Cosgrove and Martin S. Cosgrove in their individual capacities; the affidavit thereto was executed only by the mortgagor and was not sworn to by either party. The mortgage was not shown to have been recorded. The balance of the alleged purchase price of the cattle sold to Place by the petitioner on January 31, 1940; namely, $2,317.50, was credited by Place on the original mortgage dated September 23, 1939, given to Place by Martin S. Cosgrove. There was no evidence of payment by the petitioner of the balance of the alleged purchase price of $3,665. The cows "ostensibly" acquired by the petitioner as described above were kept on two farms owned or operated by Place, one in Colchester, Vermont, and the other in or near Williston, Vermont. Place had other cows on other farms, some owned by him and some by other persons, but when any cows "ostensibly" owned by the petitioner were on either the Colchester or the Williston farm, no other cows in lactation were kept on such farm. The herd on the Colchester farm, "ostensibly" owned by petitioner, was dispersed during the latter part of 1940, the date being uncertain. Some of the cows were sold at a public auction by Place and others were transferred to the Williston farm. Place then sold some other cows to the petitioner. The details of these transactions, including the number of cows sold, the number of cows retained and the number of cows "allegedly" purchased, do not appear from the record. On October 1, 1940, the petitioner executed a mortgage to R. C. Place in the amount of $4,487, upon 71 cows (plus 11 springer cows). The mortgage was presumably given as security for a note for this amount, but neither the note nor a copy thereof was offered in evidence. The affidavit to the mortgage was not sworn to and the mortgage itself was not shown to be recorded. This mortgage was prepared as an adjustment of the obligations between the petitioner and Place and "a previous note and mortgage, either those of January 31, 1940, or both, were replaced by this mortgage." On July 6, 1940, a bill of sale was executed by the Klink & Brooks Sales Company, Bucyrus, Ohio, indicating the sale of 22 cows to M. S. Cosgrove, Essex Junction, Vermont. The sale price was $1,600 and payment for the cows was made by petitioner's check dated July 5, 1940. By a check dated August 12, 1940, the petitioner paid $1,682 to the Klink & Brooks Sales Company. "It does not appear from the evidence that the 22 cows purchased by the petitioner's check for $1,600 or the cows, if any, purchased by the petitioner's check for $1,682, went to either the Colchester or the Williston farm and produced any of the milk involved. The petitioner's books, however, treat the $1,600 as a debit under the heading 'R. C. Place, Colchester' and the $1,682 as a debit under the heading 'R. C. Place, of Williston farms.'" During 1940, Gates, Rhodes, Place and Luneau carried on their farming operations in substantially the same manner as had been followed prior to 1940.

Counsel for the petitioners has conceded that a principal purpose of the petitioners was to place themselves in the status of producers under the Order.

On the basis of these facts, the Assistant to the Secretary of Agriculture concluded that the milk involved was not milk of the petitioners' own production, but milk received from producers.

The petitioners, now plaintiffs, have raised various objections to the findings, conclusions and orders of the Secretary. The plaintiffs also contend that as a matter of law the Court must find that the milk in question was milk of plaintiff's own production.

The plaintiffs have objected to the use in the findings of such words as "purported", "purportedly", "alleged", "allegedly", "ostensible" and "ostensibly", on the grounds that these words tend to indicate that the various transactions which they describe are specious. In view of the conclusions which I have reached, it is unnecessary to decide whether or not these words were properly used. It may be assumed that all of the transactions with reference to which these words were used were actually what they purported to be.

The question to be decided is whether or not the milk involved was milk of the plaintiffs' "own farm production" within the meaning of Order No 4, as amended. The same question arose on similar facts in Elm Spring Farm, Inc., v. United States, 1 Cir., 127 F.2d 920, 926.

In that case, involving a scheme, resembling in many respects the scheme in the instant case, the Court upheld a ruling of this Court that the Elm Spring Farm Cooperative was not a producer. There, as here, the Elm Spring Farm Cooperative, hereinafter called the Cooperative, executed a series of agreements by which the Cooperative purchased cattle from certain farmers, making a 25% down payment by

the issuance of shares of stock in Cooperative, and by giving a note secured by a mortgage on the cattle for the balance; and by which the farmers became "herdmasters" in substantially the same manner and with substantially the same compensation as in the instant case. The Administrator ruled that Cooperative was not a producer and when Cooperative refused to pay the amount determined to be due, the United States filed a complaint in the District Court seeking an injunction ordering Cooperative to pay such amount. The Circuit Court of Appeals pointed out that if Cooperative "had had the straightforward purpose of becoming a producer of milk it would hardly have negotiated the rather weird series of agreements" described above. The Court said that the question was "not to be determined by a purely abstract inquiry as to who had 'title' to the cows which produced the milk." Other reasons given by the Court for its decision were that Cooperative did not acquire a farm or invest any capital in milk production, that the herdsmen retained possession of their farms and the herds of cattle, that the risk of loss in the production of milk remained upon the individual farmers, that either party within a short time could demand that title be retransferred to the farmers, that the farmers were paid by Cooperative only on the basis of the quantity of milk delivered, and the amount of payment was calculated with reference to the blended price, that the plain purpose was to place Cooperative in the position of a producer and to evade payment into the equalization pool, thus obtaining competitive advantage, and that if Cooperative's contention were upheld other handlers would be driven to make similar arrangements. The Court said, 127 F.2d at page 927:

"If this claim of Cooperative should be accepted as within the law, such other handlers would be driven to making similar arrangements with their producers. The result inevitably would be that the whole regulatory scheme would break down. The maintenance of the uniform blended price to each producer, whether or not his milk goes predominantly into the fluid milk market, is impossible unless handlers who have more than the market average of fluid milk sales make the prescribed equalization payments into the pool. The Act and the Order seek to achieve a fair division of the more profitable fluid milk market among all producers, thereby eliminating the dis-organizing effects which had theretofore been a consequence of cutthroat competition among producers striving for the fluid milk market."

It is difficult to find distinctions in the instant cases sufficient to take them out of the principle of the Elm Spring Farm case. As stated above, it will be assumed that the transactions variously described in the findings of fact as "purported", "ostensible" and "alleged" were actually what they purported to be. Proceeding on this assumption, we have a situation where, prior to the periods involved in these cases, the individual plaintiff was never a producer of milk. Then the individual plaintiff entered transactions with Gates, Place and Mrs. H. C. Rhodes, whereby he purchased herds of cattle from them. In the transaction with Place, the individual plaintiff paid 12% of the purchase price by check. In the other two transactions, 10% of the purchase price was paid by check. In each case, the individual plaintiff gave a note secured by a duly recorded mortgage on the cattle for the balance of the purchase price. This was substantially the same type of transaction that was involved in the purchases by Cooperative in the Elm Spring Farm case. In the Elm Spring Farm case, in fact, there was a larger percentage of the purchase price paid as a down payment, the down payment there being twenty-five percent, while here it was only 10% or 12%. In that case, however, payment was made by issuance of shares of stock in Cooperative, while in the instant case, the down payment was by check. However, both payments constituted real and valid consideration.

In the instant case, no payment was ever made on the interest or principal of any of the notes during the period involved here, with one exception, which will be hereafter described.

After the purchases of the cows by the petitioner, the farmers, or vendors, became so-called "herdmasters" of the cows under "herdmaster" agreements, substantially the same as the one described in the Elm Spring Farm case. Payments were made to the "herdmasters" on substantially the same basis, that is, on the basis of the quantity of milk delivered with a differential for variance of butterfat content. The "herdmasters" sustained all expense of producing the milk as in the Elm Spring Farm case. The "herdmasters" agreed to indemnify the peti-

tioner for any loss sustained due to injury or death of any of the cows.

In the case of the Rhodes milk, the "herd-master" agreement was entered into by Luneau. However, he continued the same duties on the farm which he had previously performed. The expenses of producing and delivering the milk were incurred by Rhodes, and Rhodes received the proceeds of the checks issued by the petitioner to Luneau. All of the cows remained upon the farm owned or operated by the farmers or vendors, and the farmers continued to operate the farms in substantially the same manner as previously, except in the case of Gates, who made certain changes on his farm to make the milk produced eligible for sale as fluid milk under the health requirements of the City of Boston. Petitioner, as in the Elm Spring Farm case, never acquired any interest in the farms or the property thereon except the cows.

As of January 1, 1940, the individual plaintiff transferred all of his business to the corporate plaintiff. The corporate plaintiff carried on the business in substantially the same manner. The milk produced by the "herdmasters" was delivered to the corporate plaintiff under the same arrangements as had existed with respect to the individual plaintiff. There were no written "herdmaster" contracts entered into between the corporate plaintiff and the farmers. Gates changed the number of cows in his herd from time to time, but there was no change in the note and mortgage given. On May 11, 1940, Gates and one Francis M. J. Cosgrove as treasurer of the plaintiff corporation, entered into a yearly lease of Gates' farm, but there was never any rent paid under the lease. All payments for costs, expenditures and services were made by the petitioner on the basis of milk delivered by the herdmasters.

On January 31, 1940, the transactions described above between Place and the corporate plaintiff whereby the plaintiff sold certain cows to Place and Place sold certain cows to the plaintiff, were entered into. However, an examination of these transactions discloses that the net result of the various exchanges of payments and credits was that Place was actually paid only a 10% down payment on these cows and no more than 10% of the purchase price of all cows purchased by the plaintiffs from Place was ever paid.

The various other transactions described above are not sufficient, in my opinion, to warrant a holding that the principles of the Elm Spring Farm case are not applicable.

There are, however, certain distinctions between these cases and the Elm Spring Farm case. In the instant cases, the record discloses no contract or agreement between the plaintiffs and the farmers providing for revestment of title. However, the plaintiffs and the farmers undertook little risk of loss. The plaintiffs made a down payment of only 10% in two cases and of 12% in the other case. The fact that title to the cattle passed, in my opinion, can be of no avail to the plaintiffs. As stated in the Elm Spring Farm case, the question of whether the plaintiffs are producers cannot be determined by an abstract inquiry into the question of who has title.

It has been conceded that at least one of the purposes of the series of agreements and transactions in the instant cases was to place the plaintiffs in the status of producers. If it is held that the plaintiffs were producers, then "other handlers would be driven to making similar arrangements with their producers." Elm Spring Farm, Inc., v. United States, supra. The result, as pointed out in the Elm Spring Farm case, would be that the whole regulatory scheme would break down and the purposes of the Act and Order would be defeated. The schemes involved in these cases are clearly of the type which the holding of the Elm Spring Farm case seeks to strike down.

Furthermore, the proceedings in the Elm Spring Farm case arose as original proceedings in the District Court in which injunctions were sought. In the instant cases, this Court is asked to review findings, conclusions and orders of the Secretary of Agriculture. As stated above, under familiar principles, a Court will not disturb the judgment of an administrative agency unless clearly erroneous and unwarranted. See Gray v. Powell, and Federal Security Administrator v. Quaker Oats Co., supra.

The plaintiffs have objected to various findings made by the Administrator, on the grounds that they are unsupported by evidence, and the plaintiffs have further contended that certain additional findings should be made.

It is sufficient to say that, insofar as the findings complained of are material, I am of the opinion that they are supported by evidence. I am of the opinion that if

the Administrator had made the additional findings sought by the plaintiffs, insofar as they would be material and insofar as they would be warranted by the evidence, the plaintiffs would be in no better a position.

I, therefore, conclude that the rulings of the Secretary of Agriculture should be sustained and that judgments should be entered dismissing the complaints of the plaintiffs.