**ACME BREWERIES v. BRANNAN, United States Secretary of Agriculture.**

No. 30283.

United States District Court
N. D. California, S. D.

Dec. 30, 1952.

Norman A. Eisner, San Francisco, Cal., for plaintiff.

Chauncey Tramutolo, U. S. Atty. Northern District of California, San Francisco,

Cal., Edgar R. Bonsall, Asst. U. S. Atty. Northern District of California, San Francisco, Cal., J. Stephen Doyle, Jr., Sp. Asst. to Atty. Gen., Albert Parker, Attorney, Office of Solicitor U. S. Department of Agriculture, Washington, D. C., for defendant.

OLIVER J. CARTER, District Judge.

The jurisdiction of the court is invoked under 7 U.S.C.A. § 608c(15) (B) to review a ruling of the Secretary of Agriculture. That ruling was an administrative determination that an order made by the Secretary was in accordance with law and a dismissal of plaintiff's petition requesting to be exempted from the provisions of such order.

The Secretary's order was issued under the authority of the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C.A. § 601 et seq., and related to the handling of hops produced in California, Oregon, Washington and Idaho. The order includes within the definition of "handling" the use of hops.

Plaintiff is engaged in the business of brewing and selling beer. In connection with this business plaintiff grows hops on a California ranch and uses such hops in the manufacture of its beer. Plaintiff itself harvests the hops, takes all steps necessary to prepare the hops for use in the brewing of beer, and transports the hops to the brewery. Plaintiff does not produce hops for other than its own use within the State of California where the hops are grown.

The Secretary's order treats the plaintiff's use of hops in the brewing of beer in the same manner as if the hops were sold or otherwise marketed. The order provides in brief for determination of the carryover of hops, estimated consumptive demand, and the saleable quantity of the respective year's crop of hops which may be "handled." This quantity is then apportioned among growers and each grower gets certification [1] for the quantity of hops constituting his allotment. The quantity of hops representing the surplus of each grower is not certificated and cannot be sold or "used" for making malt beverages. Pursuant to the order, plaintiff is not allowed to use in its manufacture of beer all of its 1949 crop of hops. It is this limitation upon the use of its hops which precipitates the present controversy.

The issue in this case is: Was it in accordance with law for the Secretary of Agriculture to rule that the use of hops in the brewing of beer by a grower thereof, and within the state where grown, constituted a "handling" of hops within the meaning of the statute pursuant to which the instant order was issued?

The Act authorizes the Secretary to apply orders regulating the handling of hops to "processors, associations of producers, and others engaged in the handling of" hops. 7 U.S.C.A. § 608c(1). The statute denominates such persons "handlers," but defines neither "handlers" nor "handling."

It is agreed by all parties to the controversy that the words "handler" and "handling" are derivatives of the verb "handle." Plaintiff contends that the word "handle" when used in connection with agricultural commodities has a well-defined meaning. The "well-defined meaning" which plaintiff finds in the word is "to buy and sell; to deal or trade in." Thus, reasons plaintiff, since it only uses the hops which it has grown, and does not otherwise deal or trade in hops, it cannot be said to be "engaged in handling hops."

As has been often pointed out by Judge Frank of the Court of Appeals for the Second Circuit, to insist that there is but a single interpretation for a given word or a given phrase, regardless of context, is to fall into the familiar one-word-one-meaning (or "pigs is pigs") fallacy.[2] And

---

1. Certification consists of the indelible marking of each bale or other container of the hops or hop products by an authorized representative of the Control Board (established by the Secretary's order which is here under consideration) and the issuance and delivery of a "han-

dling certificate." § 986.6(d) (1), Order No. 86, Production and Marketing Administration, United States Department of Agriculture, 14 F.R. 3660.

2. See R. H. Johnson Co. v. Securities & Exchange Comm., 2 Cir., 198 F.2d 690, 696; Irwin v. Simmons, 2 Cir.,

as Professor Corbin has said,[3] "Words have no meaning; it is users of words who give them meaning." The inquiry, then, is one as to what meaning Congress gave to "handling" when it used that term in The Agricultural Marketing Agreement Act of 1937.

Speaking upon the subject of statutory interpretation, the Supreme Court of the United States in United States v. American Trucking Ass'ns, 310 U.S. 534, at pages 542–543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345, said:

"In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress. There is no invariable rule for the discovery of that intention. To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute, particularly in a law drawn to meet many needs of a major occupation.

"There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. * * *"

The Act describes the class of persons subject to regulation as "processors, associations of producers, and others engaged in the handling" of hops. Thus, it appears that in the Congressional view, processors of hops and associations of producers of hops are engaged in "handling" hops.

Processors of hops, unless also producing all the hops which they process, are a market for hops grown by farmers. Associations of producers of hops usually have as their principal function the marketing of hops produced by members of the association. A characteristic common to persons in either of these categories is that such persons receive the hops which are ready for marketing from the farmer who produced them, for the purpose of distributing such hops to the ultimate consumer.

The Act exempts two classes of persons from regulation: "any person who sells agricultural commodities or products thereof at retail in his capacity as such retailer," 7 U.S.C.A. § 608c(13) (A); and "any producer in his capacity as a producer." 7 U.S.C.A. § 608c(13) (B). The inclusion of these exemptions in the Act indicates that it was intended that the incidence of regulation should fall upon those who do something with, or something to, hops other than to grow them or to sell them at retail. The language "in his capacity as * * *" limits the exemption in each instance.

These inferences drawn from the statutory words which speak of "who is to be regulated" point to the conclusion that Congress intended to regulate those persons who perform actions directed toward the objective of moving hops which are ready for market from the hands of the grower into the hands of a retailer, or into the hands of a consumer if no retailer is involved.

Under such an interpretation, a user of hops who secures his hops directly from the producer is "engaged in handling" because his act of receiving the hops from the grower for the purpose of consumption constitutes the distributive process. The

140 F.2d 558, 560; Andrews v. Com'r of Internal Revenue, 2 Cir., 135 F.2d 314, 317; Hoffman v. Palmer, 2 Cir., 129 F. 2d 976, 984; United States v. Forness, 2 Cir., 125 F.2d 928, 932; Commissioner of Internal Revenue v. Marshall, 2 Cir., 125 F.2d 943, 947.

3. See 3 Corbin on Contracts (1951) p. 58.

producer is exempted from regulation, even though his actions might possibly otherwise be regarded as "handling." 7 U.S.C.A. § 608c(13) (B). But that is not the exact situation of plaintiff. Plaintiff is both grower and consumer. The right hand brews beer from hops cultivated by the left hand. The Act is directed toward the regulation of marketing, argues plaintiff, and consumption is not marketing, but rather, from the viewpoint of the producer of what is consumed, the antithesis thereof.

The purpose of the Act now in question was discussed by the Supreme Court of the United States in United States v. Rock Royal Co-op, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446. It was there said, at pages 574–575 of 307 U.S., at page 1013 of 59 S.Ct.:

> "The purpose of the Act is 'to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period.' To accomplish this, the Secretary of Agriculture is directed to issue orders, whenever he has reason to believe the issuance of an order will tend to effectuate the declared policy of the act. * * *" 4

The device which Congress has selected to accomplish this price maintenance, in the case of hops, is a provision for limitation of the volume of hops which can affect the market therefor during any specified period. 7 U.S.C.A. § 608c(6). The statute speaks in terms not only of limiting the quantity which can be "marketed," but also of the quantity which can be "transported to any or all markets". Provisions are included for the control of a surplus, and for the establishment of a reserve pool.

Thus, in light of the stated Congressional policy, it is evident that it is the intent of the Act to regulate "marketing conditions" for hops, rather than the more restricted subject of "marketing" of hops.

That consumption of an agricultural commodity by the producer thereof has an effect upon the market for such commodity was recognized by the Supreme Court of the United States in Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122. It was there said, at pages 128–129 of 317 U.S., at page 90 of 63 S.Ct.:

> "One of the primary purposes of the Act in question [Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1281 et seq.] was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such wheat overhangs the market and if induced by rising prices tends to flow into the market and check price increases. But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense competes with wheat in commerce. The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon. This record leaves us in no doubt that Congress may properly have considered that wheat consumed on the farm where grown if wholly outside the scheme of regulation would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices."

Plaintiff seeks to avoid the implications

4. The order in question in this case, Order No. 86, Production and Marketing Administration, United States Department of Agriculture, 14 F.R. 3660, provides, in § 986.0, " * * * Upon the basis of evidence adduced at such hearing, and the record thereof, it is found that: (1) This order, and all of the terms and conditions thereof, will tend to effectuate the declared policy of the act."

of Wickard v. Filburn, supra, by arguing that in the Agricultural Adjustment Act of 1938, which was before the Court in that case, Congress had expressly legislated that users of wheat should be regulated. Plaintiff further urges that use or consumption of hops could be included within the term "handle" only by express legislative direction. The Filburn case does not, as contended by plaintiff, stand for the proposition that the extension of regulation to users of an agricultural commodity was upheld exclusively by reason of the express legislative direction. To the contrary, the Supreme Court went to some length to indicate the reasonableness of regulating the consumption of home-grown wheat as a power ancillary to the regulation of marketing conditions for wheat.

As pointed out in the language quoted above from the Filburn case, that quantity of an agricultural commodity which is consumed by the producer thereof competes with the quantity of such commodity which is in commerce. In United States v. Wrightwood Dairy Co., 315 U.S. 110, at page 125, 62 S.Ct. 523, 529, 86 L.Ed. 726, the Supreme Court, speaking of the Act now under consideration, said:

"We think it clear that Congress, by the provisions of § 8c(1) [7 U.S.C.A. § 608c(1)], conferred upon the Secretary authority to regulate the handling of intrastate products which by reason of its competition with the handling of the interstate milk so affects that commerce as substantially to interfere with

its regulation by Congress; and that the statute so read is a constitutional exercise of the commerce power."

■ In stating this proposition, the Supreme Court relied upon the reports on this legislation by the Senate and House Committees on Agriculture, both of which stated, " * * * the proposed language makes it clear that the full extent of the Federal power over interstate and foreign commerce and no more is intended to be vested in the Secretary of Agriculture in connection with orders." See S.Rep. No. 1011, p. 9; H.Rep. No. 1241, p. 8, 74th Cong., 1st Sess. That principle declared in the Wrightwood Dairy Co. case applies here. Congress conferred upon the Secretary of Agriculture the "full extent of the Federal power over * * * commerce." That power includes the power to regulate the quantity of self-grown hops which can be consumed by a commercial user of hops where the hops consumed are in competition with hops which are on the market.

If plaintiff were permitted to use all of the hops which it produced, it would have an advantage over other producers and would force the other producers to assume an additional burden of withholding more of their hops from the market. As the advantage became apparent, more and more brewers would produce the hops which they used and finally the entire order would fail. The declared policy of Congress can be achieved only if all hops which supply the commercial demand therefor are regulated.[5]

---

5. Cf: United States v. Wrightwood Dairy Co., 315 U.S. 110, at pages 120–121, 62 S. Ct. 523, at page 527, where the Supreme Court said:

"As the court below recognized, and as seems not to be disputed, the marketing of intrastate milk which competes with that shipped interstate would tend seriously to break down price regulation of the latter. Under the conditions prevailing in the milk industry, as the record shows, the unregulated sale of the intrastate milk tends to reduce the sales price received by handlers and the amount which they in turn pay to producers. Study of the order which we have summarized makes clear that the

unregulated handler selling fluid milk can pay producers substantially less than the minimum price set in the order for milk of that class, and yet pay as much as, or more than, the 'uniform price' prescribed by the regulatory scheme for all producers, which is based upon the average price for the several classes of milk combined. Such a handler would have an advantage over others in the sale of the class of milk in which he principally deals, and could force his competitors dealing in interstate milk to surrender the market or seek to reduce prices to producers in order to retain it."

See also Shawangunk Cooperative Dairies v. Jones, 2 Cir., 153 F.2d 700,

■ The order complained of contained a finding that all of the handling of all hops grown in California is either in the current of interstate or foreign commerce, or directly burdens, obstructs, or affects such commerce. The record indicates that this finding was made upon the basis of evidence introduced at a public hearing held pursuant to the Act. Because the order which contained this finding is the same order which defined "handling" of hops as including the use thereof, it is implicit in such finding that it included hops used by plaintiff in the brewing of its beer.

■ The order contained, as is required by 7 U.S.C.A. § 608c(3), a finding that such order would tend to effectuate the declared policy of the Act. The declared policy of the Act is to establish and maintain parity prices to farmers for hops. In determining that the existing state of economic facts justified a definition of "handling" which included in specific terms those within the statutory meaning and intendment of that term, the Secretary of Agriculture was exercising authority delegated to him by Congress. With respect to the delegation of authority to the Secretary under this particular Act, the Supreme 'Court of the United States said, in United States v. Rock Royal Cooperative, Inc., 307 U.S. 533, at page 574, 59 S.Ct. at page 1013:

> "From the earliest days the Congress has been compelled to leave to the administrative officers of the Government authority to determine facts which were to put legislation into effect and the details of regulations which would implement the more general enactments. It is well settled, therefore, that it is no argument against the constitutionality of an act to say that it delegates broad powers to executives to determine the details of any legislative scheme. This necessary authority has never been denied. In dealing with legislation involving questions of economic adjustment, each enactment must be considered to determine whether it

states the purpose which the Congress seeks to accomplish and the standards by which that purpose is to be worked out with sufficient exactness to enable those affected to understand these limits. Within these tests the Congress needs specify only so far as is reasonably practicable. The present Act, we believe, satisfies these tests."

Therefore, for the reasons above stated it is adjudged and decreed that the ruling of the Secretary of Agriculture was in accordance with law. The relief sought in plaintiff's bill in equity is denied and the bill is dismissed, and plaintiff is taxed the cost of this action. Counsel for the defendant is directed to prepare an appropriate order.

---

where it was said at page 703, "If plaintiff is not the handler, the milk here must stand unregulated, with serious consequences to the producers who are de-

pendent upon the operation of the Order for payments at uniform prices with other producers."