IDEAL FARMS, INC. and Franklin Lakes Dairy Producers, Inc., Plaintiffs-Appellants,

v.

Ezra Taft BENSON, Secretary of Agriculture of the United States of America, Defendant-Appellee.

No. 13263.

United States Court of Appeals Third Circuit.

Argued Dec. 1, 1960.

Decided Feb. 27, 1961.

Rehearing Denied March 23, 1961.

Hastie, Circuit Judge, dissented.

Willis F. Daniels, Harrisburg, Pa. (Daniels & Swope, Harrisburg, Pa., Edward G. Weiss, Paterson, N. J., on the brief), for appellants.

Charles H. Hoens, Jr., Asst. U. S. Atty., Newark, N. J. (Chester A. Weidenburner, U. S. Atty., Newark, N. J., Neil Brooks, Asst. Gen. Counsel, Dept. of Agriculture, Washington, D. C., on the brief), for defendant-appellee.

Before McLAUGHLIN, HASTIE and FORMAN, Circuit Judges.

FORMAN, Circuit Judge.

This appeal attacks the validity of § 927.65 of Federal Marketing Order No. 27 (Order 27),[1] issued by the Secretary

1. References to number sections of Order 27 are found in 7 C.F.R. as of August 1, 1957.

of Agriculture pursuant to the Agricultural Marketing Agreement Act of 1937, as amended (Act), 7 U.S.C.A. § 601 et seq. Order 27 regulates the handling of milk in the New York-New Jersey metropolitan area.

During 1956 and 1957 hearings were held by the Department of Agriculture upon various proposals to amend Order 27. As a result of these hearings § 927.-65 was promulgated to be effective August 1, 1957. At that time it provided in pertinent part:

"Sec. 927.65 *Net pool obligation of handlers.* The handler's net pool obligation shall be computed pursuant to paragraphs (a) through (g) of this section: *Provided,* That milk specified in paragraph (h) of this section shall be eliminated from this computation and such milk shall be deemed excluded by the phrase 'milk received from producers' as such phrase is used in this section * * * "

\* \* \* \* \* \*

"(h) Milk specified in subparagraphs (1) through (3) of this paragraph shall be excluded from the computation of the handler's net pool obligation pursuant to this section.

"(1) Milk received from farms in Nassau and Suffolk Counties in New York, which farms are not approved for sale of milk in New York City, and milk received from farms in New York City.

"(2) Milk received at a handler's plant not in excess of an average of 800 pounds per day from such handler's own farm in the event that no milk is received at such plant from other dairy farmers, but is received from other plants.

"(3) All milk received at a handler's plant from such handler's own farm in the event that no milk is received from any other source at such plant."

Appellant, Ideal Farms, Inc. (Ideal) leases and operates 19 farms in Northern New Jersey. All of the milk from these farms is collected and shipped to a plant operated by Ideal in North Haledon, New Jersey. Appellant, in addition, buys milk from other plants. At the North Haledon plant some of the milk is bottled and sold as such, either on routes owned by Ideal or on routes owned by independent retailers. The remainder of the milk is manufactured into various forms: cheese, butter, ice cream and flavored drinks.

Appellant, Franklin Lakes Dairy Producers, Inc. conducts an almost identical, though smaller, operation to that of Ideal except it supplements the milk it produces on its own farms with milk it buys from other dairy farmers.

Appellants contended that in purporting to regulate a handler's "own-produced" milk in § 927.65 of Order 27 the Secretary of Agriculture exceeded the authority conferred upon him by the Act. They filed their petition embodying this contention and others with the Secretary and a hearing was held before a Hearing Examiner. He issued a report containing proposed findings and conclusions recommending the dismissal of the petition. Exceptions were filed to the Examiner's report and subsequently a Judicial Officer of the Department of Agriculture acting for the Secretary pursuant to authority duly delegated to him heard arguments thereon and filed his opinion dismissing their petition. Jacob Tanis, 17 Agri.Dec. 1091 (1958).

The decision of the Judicial Officer constituted the final agency decision and the appellants then filed their complaint against the Secretary of Agriculture in the United States District Court for the District of New Jersey to review his action. See 7 U.S.C.A. § 608c(15) (B). The appellants and the Secretary filed respective motions for summary judgment, arguments upon which were heard by Judge Wortendyke, who filed an opinion in which he found in favor of the Secretary, 1960, 181 F.Supp. 62, and judgment was entered pursuant thereto.

It is from that judgment that this appeal is taken. Other issues were explored before the Agency and the District Court but only one question remains

to be settled here, namely: Did the Secretary of Agriculture exceed the authority vested in him by the Act in promulgating § 927.65 of Order 27, which purports to make a handler accountable to the producer-settlement fund for milk which he produces on his own farms from his own herds?

In support of their contention appellants point to the word "purchased" as it appears in § 8c(5) (A) and (C) of the Act, 7 U.S.C.A. § 608c(5) (A) and (C).[2] They argue that only milk "purchased" is subject to regulation and that the word "purchased" cannot be construed to cover milk which they obtain from their own farms.

Before discussing the legal question presented by this appeal, a brief reference to the operation of Order 27 may be useful. Milk is classified "in accordance with the form in which or the purpose for which it is used." Minimum prices are set for each use classification. However, such minimum prices are not directly paid to the producers since they are paid a uniform price irrespective of the uses made of such milk by the individual handler to whom it is delivered. The seeming incongruity is resolved by the operation of the producer-settlement fund.

Each handler subject to the Order must report monthly to the Market Administrator as provided in § 927.50 of the Order. The report shows the total quantity of milk received by the handler from all producers, and the use to which the said milk was put by the handler. The handler then multiplies the amount of milk put to each class use by the class price and adds the resultant figures to ar-

---

2. Subsections (A), (B) and (C) of § 608c (5) are pertinent to the discussion here and read as follows:

"(5) In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no others:

"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method of fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.

"(B) Providing:

"(i) for the payment to all producers and associations of producers delivering milk to the same handler of uniform prices for all milk delivered by them: *Provided,* That, except in the case of orders covering milk products only, such provision is approved or favored by at least three-fourths of the producers who, during a representative period determined by the Secretary of Agriculture, have been engaged in the production for market of milk covered in such order or by producers who, during such representative period, have produced at least three-fourths of the volume of such milk produced for market during such period; the approval required hereunder shall be separate and apart from any other approval or disapproval provided for by this section; or

"(ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered; subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made, and (d) a further adjustment, equitably to apportion the total value of the milk purchased by any handler, or by all handlers, among producers and associations of producers, on the basis of their marketings of milk during a representative period of time.

"(C) In order to accomplish the purposes set forth in paragraphs (A) and (B) of this subsection, providing a method for making adjustments in payments, as among handlers (including producers who are also handlers), to the end that the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed in accordance with paragraph (A) of this section."

rive at a total figure, based upon amount and class price for each class, and known as the handler's net pool obligation. The handler does not owe this money to the producers from whom he received the milk, but rather owes it proportionately to all producers in the entire milk marketing area.

Upon receipt of all handlers' reports, the Market Administrator adds up the total weight of milk handled in the marketing area for the month in question. He then adds up the total use value of the milk as shown on each handler's report as the handler's net pool obligation. He then divides the weight of the milk into its total use value and arrives at a uniform price. See § 927.54 of the Order. The uniform price is commonly referred to as the "blend" price.

Under § 927.70 of Order 27 each handler must then pay his producers the uniform price as provided in the Act, 7 U.S.C.A. § 608c(5) (B) (ii).[3] Thus it can be seen that the handler owes to all producers as a class, the use value to which he puts milk received from producers, whereas the producer receives a uniform price for his milk regardless of the use to which it is put. This is known as the "market wide pool" since the uniform price is based on the utilization of milk throughout the entire marketing area.

Provision is made for the producer-settlement fund in § 927.75 of Order 27 wherein it is prescribed that, after the Market Administrator has determined the uniform price to be paid to all producers, he should calculate the amount of money that each handler owes to producers by multiplying the uniform price by the weight of the milk each handler has received. The resultant figure is compared with the handler's net pool obligation, to determine whether the handler pays into the producer-settlement fund or receives money from the producer-settlement fund. A handler whose net pool obligation is higher than the resultant figure pays the difference into the producer-settlement fund, whereas a handler whose net pool obligation is lower than the resultant figure receives the difference from the producer-settlement fund. This exchange of money among the handlers is to enable each handler to pay the uniform price to producers by making the handlers who put the bulk of their milk to a high use pay to the handlers who put the bulk of their milk to a low use.

Thus the appellants in essence seek to be exempt from making any payments into the producer-settlement fund on their "own produced" milk should their utilization thereof otherwise require such.

We now return to the legal issue presented. In its opinion the district court cited three cases as the basis for its conclusion that the regulation of "own-produced" milk by a handler is authorized by the Act. They are United States v. Rock Royal Co-operative, 1939, 307 U.S. 533, 59 S.Ct. 933, 83 L.Ed. 1446;[4] Elm

---

3. See note 2, supra, for complete text.

4. This (Rock Royal) is the leading case construing the section of the Act here involved. One of the four cooperatives concerned acted as a marketing agent for its members. It alleged that because it was merely the agent of its principals— the farmers—it could not be held to purchase the milk from them. In ruling on this contention the court said:

"* * * It is urged that cooperatives which merely act as agents for their members are not included in handlers purchasing from producers. This is said to be definitely shown by the provisions of 8c(5) (F) providing that nothing contained in the subsection shall be construed to prevent a Capper-Volstead cooperative from making distribution to its 'producers in accordance with the contract.' The Order defines a handler as including a cooperative association 'with respect to any milk received from producers at any plant operated by such association or with respect to any milk which it causes to be delivered' to other handlers. Under the provisions of the Order, Article VII, Sections 8 and 9, cooperative handlers as other handlers equalize their purchases by payment into the producer settlement fund, even though they are not required to pay the uniform price to their producers by reason of the exception of Arti-

Spring Farm v. United States, 1 Cir., 1942, 127 F.2d 920,[5] and Shawangunk Cooperative Dairies v. Jones, 2 Cir., 1946, 153 F.2d 700.[6] In each of these

cle VII, Section 1, and the provisions of 8c(5) (F), as explained at page 561 [59 S.Ct. at page 1007].

"Cooperative contracts are of two general types, sale and agency. The Central New York Cooperative operates under the agency type.

"It is obvious that the use of the word 'purchased' in the Act, Section 8c(5)-(A) and (C), would not exclude the 'sale' type of cooperative. When 8c(5) (F) was drawn however, it was made to apply to both the 'sale' and 'agency' type without distinction. This would indicate there had been no intention to distinguish between the two types by (A) and (C). The section which authorizes all orders, Section 8c(1), makes no distinction. The orders are to be applicable to 'processors, associations of producers, and others engaged in the handling' of commodities. The reports on the bill show no effort to differentiate. Neither do the debates in Congress. The statutory provisions for equalization of the burdens of surplus would be rendered nugatory by the exception of 'agency' cooperatives. The administrative construction has been to include such organizations as handlers. With this we agree. As here used the word 'purchased' means 'acquired for marketing'. Subsection (A) cannot be construed as freeing agents, cooperative or proprietary, from the requirement to account at the minimum prices for milk handled." 307 U.S. at pages 579–580, 59 S.Ct. at page 1015.

The appellants in seeking to distinguish this case from Rock Royal argue that "the Court based its opinion that the Cooperative must pay into the Producers Settlement Fund upon the fact that the Cooperative did not have its own farms."

The fact is that Order 27 as then in effect exempted "milk received from the handler's own farm." United States v. Rock Royal Co-op., supra, 307 U.S. at page 551, note 14, 59 S.Ct. at page 1002. The Court did not say, as appellants intimate, that the Act would not permit such regulation.

5. Here (Elm Springs) a cooperative organized by officers and stockholders of a pre-existing corporation, engaged in handling milk, took over the business of that corporation. It then took title to cattle from farmers giving in return mortgages and stock. The cattle did not change possession and there was little change in the farmers' status. The court held the cooperative not to be a pro-

ducer and thus not exempt from the order then in effect. In discussing the construction of the word "purchased" it was said:

"Appellant Cooperative relies upon a narrow reading of §§ 8c(5) (A)–(E) of the Act, 7 U.S.C.A. § 608c(5) (A–E). These sections, which delimit the contents of orders to be issued under the Act, refer to milk 'purchased' from producers by handlers, and 'prices' to be paid by handlers for milk so purchased. The argument is as follows: 'Nothing in the language of the Act anywhere modifies the ordinary meaning of these words or authorizes an order to contain any monetary provisions applicable to a person, i.e., in this instance, a corporation, engaged in the distribution of milk given by its own cows. In such a case it is manifestly impossible for a "purchase" to take place, with respect to milk which has been the property of such person, not merely from the instant of its being drawn into the pail, but even from the very earliest instant in its process of creation in which it could be recognized as having any existence whatsoever.' This contention is foreclosed by United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 578–581, 59 S.Ct. 993, 83 L.Ed. 1446 * * *" 127 F.2d at page 927.

6. In that case (Shawangunk) Meadow Valley Farms, a corporate handler, ceased to operate its plant but in order that some fifty producers who had formerly delivered milk to it might maintain entrance to the marketing area, it arranged to have their milk delivered to plaintiff's plant. Plaintiff sent the milk out for pasteurization and returned it to Meadow Valley Farms. When plaintiff was made accountable for the milk it brought suit. In reversing the district court 59 F.Supp. 848 which held Order 27 not applicable to a "mere gratuitous * * * bailee" the court noted, 153 F.2d at page 704:

"Nor do we think that the Order as thus construed goes beyond the terms of the governing statute. Plaintiff points out that the statute, unlike the regulation, in prescribing the terms of milk orders, uses the words 'purchased from producers' and 'purchased by handlers.' 7 U.S.C.A. § 608c(5) (A, C, D, E). But since the Rock Royal case, supra, determined that the word 'purchased' was not to be literally construed, but was to be read as the equivalent of the alternative statutory phrase 'acquired for marketing,' and since the 'acquired' of the statute can mean no

cases the word "purchased" was interpreted to mean "acquired for marketing".[7] Appellants argue that in none of these cases were the principals producers in the sense that they operated their own dairy farms and that in each case they acquired or received the milk subjected to assessment from another entity. They insist that in interpreting the word "purchase" to mean "acquire" or "receive", title or possession must have passed from one to another and that "the very words indicate that at least two parties must be involved."

In effect appellants make the argument that although an agency cooperative was held to have "purchased" milk from its principals in Rock Royal and Elm Spring, two parties were involved whereas here there being only one party no "purchase" is possible as the word was construed in those cases. Such reasoning would mean that Congress intended to regulate a handler if he was the agent of a producer, but not a handler who is also a producer, although the effect in both instances is the same. Should the fact of agency make such a crucial difference? We do not think that such an illogical distinction was intended. Although not embodying the fact pattern of specific identity of producer and handler in the one entity present in appellants' situations the three cited cases make clear that the word "purchased" is to be liberally construed so as to achieve the purpose of the Act and strongly buttress the position of the Secretary that "own-produced" milk of a handler is subject to regulation. The purpose of the Act and Order was succinctly stated in Elm Spring Farm v. United States, supra, 127 F.2d at page 927:

" * * * The Act and Order seek to achieve a fair division of the more profitable fluid milk market among all producers, thereby eliminating the disorganizing effects which had theretofore been a consequence of cutthroat competition among producers striving for the fluid milk market. This is clearly set forth in the opinion in United States v. Rock Royal Co-operative, Inc., 1939, 307 U.S. 533, 548, 550, 59 S.Ct. 993, 83 L.Ed. 1446."

Were we to accept appellants' construction of the word "purchased" they would avoid the intent of the Act to achieve a fair division of the more profitable fluid milk market among all producers and they would avoid the necessity of sharing the burden of surplus milk. See United States v. Rock Royal Co-operative, Inc., supra, 307 U.S. at pages 548, 580, 59 S.Ct. at pages 1001, 1016.

■ In the concededly broad construction here given to the word "purchased" we are guided by the pronouncement of the Supreme Court in N. L. R. B. v. Lion Oil Co., 1956, 352 U.S. 282, 77 S.Ct. 330, 334, 1 L.Ed.2d 331 that "in expounding a statute, we must not be guided by a single sentence or member of a sentence but look to the provisions of the whole law, and to its object and policy." To the same effect are United States v. American Trucking Ass'ns, 1940, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 and Helvering v. Stockholm Enskilda Bank,

---

more than the 'received' of the regulation, plaintiff's contention is reduced to its claim that it did not acquire the milk *for marketing*. With this, however, we cannot agree, for, since no milk can enter the New York market without prior reception at an approved plant, plaintiff's acts here were indispensable to the total routing of the milk from the farms of the producers to its destination in New York City.

"In view of this interpretation of the Act, the objections made to the regulation and repeated here as pointing also to stat-utory requirements—the necessity of a legal title, of a proprietary interest as distinguished from that of a gratuitous bailee, and of a more personal relation between individual handler and producer—all fall as irrelevant. We think the Order was properly construed by the War Food Administrator and, as construed, is legal * * *"

7. See Grow v. Milk Control Commission, 1944, 52 Pa.Dist. & Co.R. 225 where the court held that a handler did "purchase" milk produced by his own herd.

1934, 293 U.S. 84, 55 S.Ct. 50, 79 L.Ed. 211.

Other provisions of this section of the Act explicitly recognize that a person or business entity may be engaged in the milk business in more than one capacity and that a producer is exempt from regulation only in his capacity as a producer. Section 8c(13) (B), 7 U.S.C.A. § 608c (13) (B), provides:

"No order issued under sections * * * 608c * * * of this title shall be applicable to any producer in his capacity as a producer."

In Acme Breweries v. Brannan, D.C.N.D. Cal.1952, 109 F.Supp. 116, the court had occasion to construe this provision. There the plaintiff was a manufacturer of beer and grew its own hops. The Secretary of Agriculture issued an order regulating the handling of hops. Plaintiff argued that it was not engaged in the " 'handling' of hops" since it only used the hops it grew. The court held, however, that while Acme was exempt from regulation as a producer under § 8c(13) (B) of the Act it could be regulated as a handler since it did something to the hops other than grow them. It was a part of the distribution system that Congress intended to regulate.

Appellants attack any reliance on Acme Breweries v. Brannan, supra, claiming that sections of the Act controlling milk, 7 U.S.C.A. § 608c(5) (A–G) and § 608c (18) differ substantially from those regulating hops, § 608c(6) (A–G). Appellants call attention to the former in which reference is made to "milk purchased" and to the latter where the words "purchase from or handle" or "purchased, or handled" are used. § 608c(6) (B). They vigorously argue that there was clearly spelled out in the Act authority to limit the total quantity of hops to be handled among all producers and allotting the quantity of hops which any handler might handle. Such contentions are not denied but they are not persuasive that the different language used in the regulation of hops and other commodities compels the conclusion that it was not the intention of Congress to regulate a handler of milk who dealt also with his "own-produced" milk. In Acme Breweries the plaintiff indeed argued that the word "handle" had a well defined meaning, i. e., "to buy and sell; to deal or trade in" and that since it was a consumer of its own hops it could not be held to handle them. The court rejected this argument and looking to the purpose of the Act and the specific exemptions in § 8c (13) (A) and (B) held plaintiff to be a handler and subject to regulation. The court reasoned as noted above that while a producer may not be regulated per se Congress did intend to regulate him should he engage in the capacity of a handler. The analogy to this case is cogent. Moreover the thrust of appellants' argument goes directly counter to the liberal construction given to the word "purchased" in United States v. Rock Royal Co-operative, Inc., supra, and Shawangunk Cooperative Dairies v. Jones, supra, where it was held to apply to an agency cooperative and a gratuitous bailee respectively.

Section 8c(5) (C) which is the statutory basis for the producer-settlement fund indicates that producers who are handlers are subject to regulation. That section provides:

"In order to accomplish the purposes set forth in paragraphs (A) and (B) of this subsection, providing a method for making adjustments in payments, as among handlers (including producers who are also handlers), to the end that the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed in accordance with paragraph (A) of this section." (Note 2, supra.)

It could be argued that the parenthetical phrase was included merely to make it clear that producer handlers could be made to equalize on milk purchased from other producers. If this were all that was intended it seems hardly necessary to have included the parenthesis since a handler who purchased milk from other producers would clearly be covered as a handler with respect to such milk wheth-

er or not he might be a producer-handler with respect to milk of his own production. The more reasonable construction is that the parenthetical phrase was meant to reach a producer-handler who handles or distributes milk which he himself produces.

Regulation of producer-handlers in their capacities as handlers is not of recent origin. Article VI, § 1(3) of the original Order 27 regulated such handlers in that it only permitted them to "[s]ubtract pro rata out of each class the quantity of milk received from the handler's own farm," in the computation of their "Net Pool Obligation". See Rock Royal Co-operative, Inc., supra, 307 U.S. at page 551, note 14, 59 S.Ct. at page 1002. In 1941 Order 45 (7 C.F.R. 945.1 et seq., effective August 29, 1941), affecting the Washington, D. C. area, charged each handler a certain amount per hundredweight with respect to all milk received from producers including his "own-produced milk" to defray the expense of administration. In 1946, Order 4, affecting the Greater Boston Area (7 C.F.R. 904.1 et seq., effective June 1, 1946) imposed a similar charge. Since August 1, 1953, Order No. 3 (7 C.F.R. 903.1 et seq.) affecting the St. Louis Marketing Area has required handlers to pay into their producer-settlement fund on milk received from their own farms. See In re Benbush Dairy, 17 Agri.Dec. 1185 (1958). Similarly Order No. 19 (7 C.F. R. 919.1 et seq.) involving the Southwest Kansas Marketing Area has required such payments since July 1, 1954.

See In re Sunflower Dairy, 15 Agri.Dec. 1 (1956).

■ While it is true that only since 1953 have handlers been required to make payments into the producer-settlement fund it is also true that from the very beginning the Department of Agriculture has construed the Act so as to permit regulation of producer-handlers in their capacities as handlers. This contemporaneous and long standing construction of the Act by the agency charged with administering it is entitled to substantial weight. United States v. Leslie Salt Co., 1956, 350 U.S. 383, 396, 76 S.Ct. 416, 100 L.Ed. 441; Mazer v. Stein, 1954, 347 U.S. 201, 213, 74 S.Ct. 460, 98 L.Ed. 630; 1 Davis Administrative Law § 5.06 (1958).

The present provisions of the Act were first enacted as amendments to the Agricultural Adjustment Act of 1933, 48 Stat. 31, by the Act of August 24, 1935, 49 Stat. 750.[8] In 1936 the Supreme Court held invalid certain sections of the Agricultural Adjustment Act of 1933 with respect to processing taxes. United States v. Butler, 1936, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477. Thereafter Congress reenacted the section under discussion here in the Marketing Agreement Act of 1937, 50 Stat. 246.

While the 1935 amendments were before the Senate a discussion took place which indicates that Congress intended that producer-handlers be regulated in their latter capacity. This discussion in which Senators Copeland, Byrd and Murphy took part is set out in the margin.[9]

8. These amendments originated in H.R. 8492 which was before the Senate. See 79 Cong.Rec. 11, 130 (1935) and 79 Cong. 9568, 9569, 9570 (1935).

9. At first the matter was commented upon by Senators Copeland and Murphy:
"Mr. Copeland. In up-State New York a great many of the milk handlers are producers and distributors. According to the amendments as they are set up, if I am correctly advised, every one of those who may directly burden, obstruct, or affect interstate commerce would be sub-

ject to all the orders promulgated by the Secretary of Agriculture. These producers and distributors would be required to make adjustments in payments by being compelled to contribute to the maintenance of an adjustment or equalization fund and to pay their pro rata share of the expenses to the authority or agency which administers the order. Therefore the distributors who have an additional investment in not only producing their own milk but also in pasteurizing the milk, which is absolutely necessary under the law, would have to share their posi-

The appellant deprecates the use of this legislative history contending that "a study of the record of this discussion discloses that no conclusions were reached." We do not agree. The record clearly discloses that the Senate was discussing H.R. 8492 in which the 1935 amendments were embodied and that these amendments were finally accepted and passed. The Senators were discussing the provisions of the Act which we are here construing. Appellants also cite the concurring opinion in Schwegmann Bros. v. Calvert Distillers Corp., 1951, 341 U.S. 384, 395, 71 S.Ct. 745, 751, 95 L.Ed. 1035 [10] to support their opposition to the use of legislative history here.

We first note that the explanation of the milk provisions of the Act made by Senator Murphy were not mere "casual statements from floor debate" but were comments of a senator who clearly appears to have been in charge of those provisions on the Senate floor. Resort may be had to the statements of such an authoritative person. Wright v. Vinton Branch, 1937, 300 U.S. 440, 464, note 8, 57 S.Ct. 556, 81 L.Ed. 736; Duplex Printing Press Co. v. Deering, 1920, 254 U.S. 443, 475, 41 S.Ct. 172, 65 L.Ed. 349; Richbourg Motor Co. v. United States, 1929, 281 U.S. 528, 536, 50 S.Ct. 385, 74 L.Ed. 1016; Sutherland, Statutory Construction §§ 5011, 5012 (3rd ed. Horack 1943); Note, A Decade of Legislative History in the Supreme Court, 46 Va.L. Rev. 1408 (1960). For the use of such statements of explanation in recent cases see e. g., Mitchell v. Kentucky Finance Co., 1959, 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815; Steiner v. Mitchell, 1956, 350 U.S. 247, 254, 76 S.Ct. 330, 100 L.Ed. 267.

Appellants also object to the use of legislative history where the statutory language is unambiguous. That the language is not unambiguous would seem to flow from the holdings in Rock Royal and Shawangunk cases, supra. In any event, the words of Justice Frankfurter in Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 1954, 348 U.S. 437, 444, 75 S.Ct. 489, 492, 99 L.Ed. 510 now appear pertinent:

"This examination would conclude the construction of the section by English courts, that is, by any court

---

tion in the market with other producers. Is that correct?

"Mr. Murphy. Yes; that is correct." 79 Cong.Rec. 11,138 (1935).

A short time later the following discussion took place between Senators Byrd and Murphy:

"Mr. Byrd. Mr. President, a little while ago the Senator stated that the producer could exercise his own choice as to going into these marketing agreements or staying out of them. I doubt whether that statement is quite correct, because if a producer handles his own milk he becomes a handler and therefore is subject to all the rules and regulations affecting handlers.

"Mr. Murphy. The point that the producer and the handler cannot be regulated at the same time is well taken. But the producer who is also a handler is not denied a voice. He can vote as a producer.

"Mr. Byrd. He can vote, but once the marketing agreements are established he is subject to the marketing agreement as a seller of milk.

"Mr. Murphy. Precisely.

"Mr. Byrd. Therefore, as a producer, he is being regulated possibly without his consent.

"Mr. Murphy. Well, he has voted on the question. We provide for two-thirds majority rule. How much more majority do Senators want? Suppose 66⅔ percent of the producers are in favor of this plan, and one-third are not in favor of it; who should be our guide?" 79 Cong. Rec. 11,140 (1935).

10. That opinion by Justice Jackson, in which Justice Minton joined, reads in part, as follows:

\* \* \* \* \*

"Resort to legislative history is only justified where the face of the Act is inescapably ambiguous, and then I think we should not go beyond Committee reports, which presumably are well considered and carefully prepared. I cannot deny that I have sometimes offended against that rule. But to select casual statements from floor debates, not always distinguished for candor or accuracy, as a basis for making up our minds what law Congress intended to enact is to substitute ourselves for the Congress in one of its important functions \* \* \*"

reading legislation as it is written without drawing on parliamentary debates. And considering that the construction we have found seems plain, the so-called 'plain meaning rule,' on which construction is from time to time rested also in this Court, likewise makes further inquiry needless and indeed improper. But that rule has not dominated our decisions. The contrary doctrine has prevailed. See Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48 [49 S.Ct. 52, 53, 54, 73 L.Ed. 170]; United States v. Dickerson, 310 U.S. 554, 561 [60 S.Ct. 1034, 1038, 84 L.Ed. 1356]. And so we proceed to an examination of the legislative history to see whether that raises such doubts that the search for meaning should not be limited to the statute itself."

Appellants argue that prior to August 1, 1957 "own-produced" milk was not subject to regulation and that because present conditions may require such regulation the breadth of the legislation may not be extended to cope with present exigencies. As to prior regulation we have established that the original Order 27 did so provide. But even were this not so, it has been established that the regulation of "own-produced" milk goes back in other areas to 1941. That such regulation may not have been included in Order 27 does not detract from the fact that the Department of Agriculture has for so long a time considered "own-produced" milk to be subject to regulation. We agree that the Department may not ex-

tend the breadth of the Act in order to meet present exigencies. But we do not agree that is what has been done.

In their brief and at the oral argument appellants urged that

"* * * of the ten billion pounds of milk accounted for in the New York and Northern New Jersey Milk Marketing Area, the quantity reported by handlers' 'own production' is infinitesimal. It has been determined that requiring all handlers who produce their own milk to account for it in the 'pool' results in an increase of payment to other producers in the area of 5 mills per cwt. of milk. * * *"

Appellants estimate that this would amount to $9.00 per year per producer whereas their own costs would rise $36,-000 per year. They concede that this argument is advanced for the purpose only of supporting their position that the Act does not authorize the contested regulation. In effect, they argue that the amount of handlers' "own-produced" milk is allegedly so small (and the burden of the regulation so onerous upon the producer-handler) that it is unreasonable to assume that Congress intended to authorize such regulation. From what we have said before concerning the overall purpose of the Act it is obvious that we cannot agree. Moreover, the finding of facts and reasoning by the Secretary leading to the determination that § 927.-65 of the Order is designed to protect the regulatory scheme of the Act and is authorized by it,[11] when viewed in the

11. "3. Pursuant, in part, to a notice issued February 26, 1957 (22 F.R. 1219), a public hearing was held on a proposal, among others for amendment of the milk marketing order regulating milk handling in the New York metropolitan area. Some of the evidence bearing on the contested provision adduced at such hearing appears in the paragraph below.

"Producer-dealers in general have largely a Class I or fluid utilization of milk. In Northern New Jersey, there are 62 producer-distributors (receiving no milk from others) and 22 dealers with producing farms. They are an im-

portant segment of the industry, producing seven percent, or 59,000,000 pounds, of the annual production of milk in the area, with five percent of Class I sales in such area. In view of the number of producer-dealers and their importance, their milk should be pooled with no exemption except for certified milk. Complete exemption would result in a competitive advantage to producer-dealers equal to the difference between the blend price and the Class I price on their Class I sales. A handler with a high fluid utilization would have to make such payments to the pool. Ex-

light of his expertise, overcomes the appellants' argument.

Appellants place great reliance on two cases. They are Dairymen's League Cooperative Association v. Brannan, 2 Cir., 1947, 173 F.2d 57 and Vance v. Benson, (S.D.Miss.) unreported, and now on appeal.

In Dairymen's League, the plaintiff was a cooperative which had acquired milk from its producers at so called country plants in New York where it was made into cream and sent to its plant in Newark, New Jersey, from where it was sold to other handlers. Dairymen's League alleged that the shipment from one of its plants to another constituted a purchase which would have afforded it a lower value on the cream. It first should be noted that the court in that case was not called upon to construe the word "purchased" found in § 8c(5) (A) and (C) of the Act, 7 U.S.C.A. § 608c(5) (A) and (C), but was construing the word "purchaser" used in defining Class III–D milk in § 927.4(b) (7) of Order 27 as it then existed.[12] Second, the cream there moved from one handler operation to another handler operation within the same business entity and did not, as here, move from a producer operation to a handler operation. The court rejected the contention of Dairymen's League that shipments from its country plants to its Newark plant constituted the latter a "purchaser" as that term was used in § 927.4 (b) (7). Since the context in which the word "purchaser" was used in Dairymen's League and the purpose involved there are clearly distinguishable from the situation here the appellants fail to derive the claimed aid from it.

In Vance v. Benson, supra, the court, on facts similar to those at bar, held that a handler could not be regulated with respect to his "own-produced" milk. With due deference to that court, we cannot agree.

■ In view of the foregoing we hold that Judge Wortendyke correctly concluded:

"* * * that the provisions of § 927.65 of Order No. 27 are fully in accord with the enabling statute and that the refusal of the Secretary to exempt the plaintiffs (appellants) from the obligation to include their own-produced milk in the calculation of their net pool obligations, was in all respects legal and within his statutorily delegated power." [181 F. Supp. 73].

The judgment of the district court will be affirmed.

emption of producer-dealers would open the way to economically unjustified expansion by such handlers due to the competitive advantage resulting from non-regulation. The family-farm type of producer-dealer operation should be exempt from pooling. It should be considered in relation to producers of the same production and not to other handlers. A fixed quantity exemption of a daily average of 1,000 pounds of milk should cover the family-farm type of operation with 50 to 60 cows and such businesses are not sufficiently significant to constitute a serious competitive factor in the marketing area. Handling of more than this amount or buying from or selling to other producers or handlers should result in pooling of a producer-dealer's entire production. There are 200 or 300 producer-dealers in Northern New Jersey and Upstate New York and pooling their milk with the milk of all other producers would increase the blend price although such price would not be greatly increased thereby. The question of equity between producer-dealers and other producers and handlers is an important consideration. A producer who bottles and sells all his milk but one can and sends that can to a country plant of another handler pools his surplus but does not pool his fluid utilization. Other producers must share in the total market utilization." Jacob Tanis et al., 17 Agri.Dec. 1091, 1093–1094.

12. It was there provided:
"Class III–D milk shall be all milk the butterfat from which is delivered as cream to a *purchaser, not a handler*, outside the State of New York and outside any county in other States in which there is a plant which is approved by any health authority for the receiving of milk to be sold in the marketing area, also milk the butterfat from which leaves or is on hand at a plant in the form of cream cheese." (Italics supplied.) 7 C.F.R., 1938 Supplement.

HASTIE, Circuit Judge (dissenting).

The marketing order in controversy was issued under the authority conferred upon the Secretary of Agriculture by section 8c(5) of the Agricultural Marketing Agreement Act of 1937, as amended. 7 U.S.C.A. § 608c(5). If authority for its provisions cannot be found there, then it is conceded that the order is illegal.[1] That subsection begins by specifying that an order issued under its sanction shall contain only those "terms and conditions" which are specified in the detail of its text. The provision thought to be relevant here appears in subsection 8c(5) (A) and authorizes the fixing of certain minimum prices "which all handlers shall pay * * * for milk purchased from producers * * *." An additional reference to the same subject matter in subsection 8c(5) (C) does not require any separate or additional comment.

The complaint here is that a marketing order under section 8c(5) (A) and (C) has made the plaintiffs, as handlers of milk, accountable to the general producer-settlement fund for milk produced by their own cows on their own farms. The question of statutory construction is, in what meaningful sense can it be said that there has been a "purchase" of milk by a "handler" from a "producer" where an individual both produces and handles his own milk?

I would agree with the result the court reaches if I could find a satisfactory affirmative answer to this question, but I can find none. The opinion of the court quotes the old and properly repeated admonition of the Supreme Court that "in expounding a statute, we must not be guided by a single sentence or a member of a sentence, but look to the provisions of the whole law, and to its object and policy." See N. L. R. B. v. Lion Oil Co., 1957, 352 U.S. 282, 288, 77 S.Ct. 330, 334, 1 L.Ed.2d 331, quoting from United States v. Boisdoré's Heirs, 1850, 8 How. 113, 122, 12 L.Ed. 1009. In relating this language to the present situation the court demonstrates most persuasively that it is equitable and advances the overall scheme and purpose of the Act to regulate producer-handlers as has been done in Marketing Order No. 27. But if Congress has used restrictive language in the relevant operative provision of a statute, resort to the overall purpose of the legislation does not in my view justify relaxing a stated restriction in a way inconsistent with any reasonable construction of the restrictive language itself.

Here the operative language of the statute authorizes certain impositions upon handlers of milk who purchase from producers, and nothing more than that. It seems to me that no reasonable construction can make the "purchase" concept cover the conduct of persons who as handlers simply process and distribute milk they have produced on their own farms.

I am not unmindful that in United States v. Rock Royal Co-Operative, Inc., 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446, the Supreme Court held that a cooperative handling milk acquired from individual producers who are members of the cooperative is a "purchaser" from these members, whether the cooperative is of a "sale" type or an "agency" type. But the Court caused this decision to turn upon the fact that Congress had made subsection 8c(5) (F) expressly applicable to both types of cooperatives, thereby indicating that no distinction should be made between types of cooperatives in the companion subsections 8c (5) (A) and (C). But the special treatment of cooperatives in section 8c(5) does not in my view afford any basis for the present interpretation of "purchase" in a case involving merely one individual

---

1. Here, different from United States v. Lehigh Valley Cooperative Farmers, Inc., 3 Cir., 287 F.2d 726, neither the Secretary of Agriculture nor the court has undertaken to justify the order under the "incidental" and "necessary" powers conferred upon the Secretary by subsection 8c(7) (D). Nor do I see how regulation of milk not purchased could fairly be described as incidental and necessary to the regulation of milk that is purchased.

who produces and handles his own milk as distinguished from a cooperative which handles milk for its several members.

Perhaps Congress overlooked the fact that the language it used excluded the individual who handles his own milk. Perhaps, advised of this restriction, Congress would wish to broaden the statute. Certainly, the argument of the government to us and the opinion of this court make a strong case for doing so. But I am unable to avoid the conclusion that by judicial decision we are now giving the Secretary of Agriculture authority which the statute as enacted by Congress withheld. I cannot reconcile such action with my understanding of the restricted role our polity assigns to courts in construing and applying statutes. Therefore, I regretfully dissent from a decision which may well be very helpful to the orderly and effective regulation of a vital industry.